# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 43652

| | |
|---|---|
| IN THE MATTER OF:  JANE DOE,<br>A Child Under the Age of 18 Years.<br>--------------------------------------------------------<br>IDAHO DEPARTMENT OF HEALTH<br>AND WELFARE,<br><br>    Petitioner-Respondent,<br><br>v.<br><br>JANE DOE (2015-21),<br><br>    Respondent-Appellant,<br>and<br><br>AIMEE' STORS, CASA WORKER,<br><br>    Guardian Ad Litem-Respondent. | Boise, February 2016 Term<br><br>2016 Opinion No.  38<br><br>Filed:  March 24, 2016<br><br>Stephen W. Kenyon, Clerk |

Appeal from the District Court of the Second Judicial District of the State of Idaho, Nez Perce County.  Hon. Michelle Evans, Magistrate Judge.

The judgment of the magistrate court is <u>affirmed</u>.  Costs on appeal are awarded to respondent.

Knowlton & Miles, PLLC, Lewiston, attorneys for appellant. Mackenzie J. Welch argued.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, attorneys for respondent Idaho Department of Health and Welfare. Marcy J. Spilker argued.

Nolta Law Office, Lewiston, attorney for respondent guardian ad litem. Paige M. Nolta argued.

_____

W. JONES, Justice

## I. NATURE OF THE CASE

The magistrate court for Nez Perce County terminated Appellant Jane Doe's ("Mother") parental rights to her nine-year-old child ("Child") for neglect. Mother raises the following arguments challenging the magistrate court's decision: (1) the magistrate court's finding of

1

neglect is not supported by clear and convincing evidence; (2) the magistrate court should have rejected the Idaho Department of Health and Welfare's ("IDHW") petition to terminate parental rights because IDHW had failed to make reasonable efforts to reunify Mother and Child; (3) the magistrate court abused its discretion when it took judicial notice of findings from a prior proceeding; and (4) the magistrate court abused its discretion when it admitted evidence of IDHW's efforts to determine whether the Indian Child Welfare Act applied to Child.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Appellant is the mother of three children, including Child who is the middle child. Child and Younger Sister are the offspring of Mother and Father. Older Sister is the offspring of Mother from a prior marriage. Father is currently serving a fifteen-year sentence for sexually abusing Older Sister over a period of eight years. IDHW began its investigation of Mother's care for Child following a one-vehicle collision involving Mother, Child, and Younger Sister.

### A. IDHW responds to Child's needs following a collision.

On April 5, 2014, Mother was driving south on U.S. Highway 95 in a 2006 Jeep Commander with Child and Younger Sister when she drove off the road. The Jeep was moving fast enough that after traveling down a grassy embankment it ran through a fence, sheared off a power pole at ground level, and rolled sideways at least two times. No one was wearing a seatbelt and all three occupants were ejected from the Jeep when it rolled over. Mother and Child where hospitalized for their injuries and Younger Sister died.

Witnesses at the scene reported that Mother smelled like alcohol. Law enforcement "found a 750 ml bottle of Bacardi Gold Rum about 2/3rds full on the floor of the back seat." The toxicology report indicated that Mother's BAC was 0.102. Mother and Child were transferred to Sacred Heart Medical Center for treatment where employees observed that Mother was "obviously intoxicated."

On April 6 and 8, 2014, IDHW interviewed Mother about the collision and her ability to care for Child. Mother originally denied drinking before the collision but did admit that she had taken a Xanax. She later admitted to "having a couple glasses of wine" in addition to the Xanax. Regarding Child's care after discharge from the hospital, Mother indicated that Grandmother, who resides in Oregon, could care for Child.

IDHW assigned social worker Chrissy Edmonson to the case. In determining Grandmother's fitness to care for Child, Ms. Edmonson learned from a child protection social

worker in Oregon that Grandmother would be an excellent placement option for Child. The Oregon social worker also informed Ms. Edmonson that Father had sexually abused Older Sister and had recently been charged for those crimes. Before issuing charges, the State of Oregon had entered a protection order against Father, but Mother continued to allow him to contact her children. Following her conversation with Oregon child protective services, Ms. Edmonson called Mother and informed her that the IDHW was asking Grandmother to seek guardianship of Child. On April 9, 2014, Child was discharged into Grandmother's custody.

B.      **The State commences proceedings under the Child Protective Act.**

On May 8, 2014, the Chief Deputy Prosecutor for Nez Perce County filed a petition with the magistrate court to determine whether Child was within the jurisdiction of the Child Protective Act, Idaho Code section 16-1603(1), and was abused, neglected, or lacking a stable home environment. That same day, the magistrate court filed an order that Child would remain in the physical custody of Grandmother pending a shelter care hearing.

The magistrate court held shelter care hearings on May 12 and 16 and June 11, 2014, wherein the magistrate court determined that returning Child to Mother's custody would be contrary to Child's health and welfare despite IDHW's "reasonable efforts" to reunify Mother and Child. On June 13, 2014, the magistrate court asserted jurisdiction over Child pursuant to Idaho Code section 16-1603(1) and issued a temporary custody order pursuant to Idaho Code section 16-1615(5). In support of its order, the magistrate court found: (1) there was reasonable cause to believe that Child fell within the jurisdiction of the Child Protective Act, based on Mother's stipulation to abuse, neglect, or lack of a stable home environment; (2) it was in the best interest of Child to vest legal custody in the IDHW pending an adjudicatory hearing; and (3) reasonable efforts had been made, but were not successful, in eliminating the need for placement of Child in shelter care.

On July 11, 2014, the magistrate court held an adjudicatory hearing pursuant to Idaho Code section 16-1619. On July 17, 2014, the magistrate court issued its findings and decree from the adjudicatory hearing. Reaffirming its jurisdiction over Child due to neglect, the magistrate court placed Child under IDHW's legal custody based on the following findings: (1) giving custody to Mother would be contrary to Child's welfare; (2) giving IDHW legal custody was in Child's best interest; and (3) IDHW made reasonable efforts to prevent or eliminate the need for

3

placing Child in foster care, but such efforts were unsuccessful as a result of Child's safety needs.

On July 28, 2014, the magistrate court held a case plan hearing pursuant to Idaho Code section 16-1621. On August 1, 2014, the magistrate court approved a case plan for Mother that required her to:

> [D]emonstrate that substance use (including alcohol use due to its significant impact on her family) is not present and that substance use and mental health issues do not impact her ability to provide for [Child's] physical, emotional, and developmental needs. [Mother] needs to ensure that her relationships are free from domestic violence or other concerning or controlling behaviors and she needs to demonstrate safety and stability in her choices and actions. [Mother] must also demonstrate an ability to meet [Child's] needs and provide [Child] with safe housing.

Additionally, the case plan required Mother to undergo a substance abuse evaluation and comply with treatment recommendations stemming from that evaluation. The magistrate court ordered all parties to comply with the case plan on penalty of contempt.

Regarding Child's care following the case plan hearing, the magistrate court continued IDHW's legal custody based on its findings that: (1) Child is not an Indian child under the Indian Child Welfare Act; (2) continuing IDHW's legal custody was in Child's best interest; and (3) IDHW made reasonable efforts to prevent or eliminate the need for placement of Child in foster care.

## C.     Mother struggles with the Case Plan.

To address her mental health issues, Mother engaged a licensed counselor, Larry Terherst, at Nimiipuu Behavioral Health. Mother scheduled weekly sessions with Mr. Terherst but from her first meeting on September 12, 2014, to her last meeting on February 10, 2015, she attended only six out of twenty-three possible sessions.

On September 15, 2014, Mother submitted a self-reported substance abuse evaluation at Nimiipuu Behavioral Health. Based on Mother's report that she drank on occasion but not very often, the evaluator recommended that Mother attend an eight hour Alcohol and Drug Information School ("ADIS") education course. IDHW protested that ADIS would be insufficient to address the full extent of Mother's alcohol abuse but the evaluator declined to recommend additional treatment because the evaluation was confined to Mother's self-reported drinking history.

4

Between September 15, 2014, and April 6, 2015, Mother admitted that her substance abuse evaluation did not fully reflect her alcohol problem and she was arrested twice for alcohol abuse related conduct. Pursuant to Idaho Code section 16-1622(1) and in response to these events, the magistrate court held review hearings through the end of 2014, on September 15, November 10, December 22, and on February 9, 2015. Following each hearing, the magistrate court found: (1) continuing IDHW's legal custody was in Child's best interest; and (2) IDHW made reasonable efforts to prevent or eliminate the need for placement of Child in foster care. The insufficiency of Mother's alcohol abuse treatment combined with her several arrests ultimately culminated in IDHW filing a petition to terminate her parental rights.

On September 29, 2014, Mother was indicted on two felony charges arising out of the April 5, 2014 collision—Vehicular Manslaughter and Injury to Children. She posted bond the following day.

In October or November 2014, Mother began attending ADIS education classes. She completed the course on February 3, 2015. However, in December 2014, IDHW modified the case plan to require random urinalysis testing. Ten urinalysis tests were scheduled between December 2014 and March 2015. Mother did not fail any test but missed seven tests and submitted to only one make-up test.

On February 8, 2015, police arrested Mother for Misdemeanor DUI. Police stopped Mother for driving the wrong direction down a one way street, smelled alcohol on her breath and arrested her when she failed the standard field sobriety test. The next day, February 9, 2015, Mother admitted to IDHW that her alcohol problems were greater than she had reported in her substance abuse evaluation. Mother requested IDHW to assist her in obtaining additional treatment. IDHW arranged a Global Appraisal of Individual Needs ("GAIN") assessment for Mother which she submitted to on February 25, 2015. The GAIN assessment determined: (1) she had last used alcohol on February 21, 2015; (2) her longest period of sobriety during the preceding ninety days was four days; (3) of the ninety days leading up to the assessment she had used alcohol during twenty of them—thirteen to the point of intoxication. Mother admitted that she could not stop using alcohol on her own and that she did not use alcohol just occasionally (as she had reported to Nimiipuu Behavioral Health during her initial evaluation). As a result of the GAIN assessment, Mother was diagnosed as alcohol dependent.

In response to Mother's Misdemeanor DUI arrest, the State filed a motion to revoke Mother's bond. The magistrate court held a bond revocation hearing on March 4, 2015, where it denied the motion but modified the terms of Mother's release by directing her not to consume alcohol, not to enter any bars, and not to operate a motor vehicle. The next day, March 5, 2015, police arrested Mother for Battery and Disorderly Conduct. Mother had driven to a casino, was intoxicated, and assaulted a casino patron by attempting to strike her in the face. During the arrest, Mother was uncooperative, screaming and yelling, and otherwise noncompliant. The State filed a new motion to revoke Mother's bond which the magistrate court granted. Mother was incarcerated on March 6, 2015, where she remained until August 26, 2015. Due to her incarceration, Mother was unable to pursue treatment recommended after her GAIN assessment.

On March 9, 2015, IDHW notified Mother of its intent to request that her permanency hearing be moved up due to her incarceration. After that meeting Mother refused any further communication with IDHW caseworkers. The magistrate court held a permanency hearing on April 6, 2015, and on April 10, 2015, entered an order approving a permanency plan for Child with the goal of terminating parental rights and subsequent adoption. Additionally, the magistrate court suspended IDHW's duty to make reasonable efforts to reunify Mother and Child.

**D.     The State commences proceedings to terminate Mother's parental rights.**

On April 15, 2015, IDHW filed a petition to terminate Mother and Father's parental rights. The petition charged Mother with neglecting Child pursuant to Idaho Code sections 16-2005(1)(b), 16-2002(3)(a), and 16-1602(28)(a). The petition against Father was based on his inability to parent due to his incarceration pursuant to Idaho Code section 16-2005(1)(e).

The magistrate court held termination hearings on July 10 and August 10, 2015. Hearings began with the magistrate court, on the State's motion, taking judicial notice of the findings entered after the July 11, 2014 adjudicatory hearing to establish the basis for the magistrate court's jurisdiction. Thereafter, the magistrate court heard the testimony of Older Sister, Grandmother, Ms. Edmonson, Mr. Terherst, and Father.

Older Sister opined that she had received poor care from Mother when she was young. She testified that Mother and Father had an extensive and continuous drinking pattern that often left her to care for her two younger sisters. She witnessed Father physically abuse Mother on multiple occasions and was herself the victim of years of sexual abuse from Father. Older Sister believed Mother knew about the sexual abuse because Mother had caught Father in bed with her.

After that event, Mother left with Older Sister to Grandfather's house but returned with Older Sister to live with Father a few days later. Older Sister testified that Mother made her and Father apologize to each other but made no effort to protect her children.

Grandmother testified to Mother's inability to care for Child and Child's condition since placement in Grandmother's custody. When her granddaughters were young, Grandmother had frequent contact with them and Mother. However, she did not discover the extent of Mother's alcohol abuse until Older Sister was seven when Mother, calling from a hospital, told her that Older Sister was home alone. Grandmother retrieved Older Sister and found candles burning in the home.

Regarding Mother's relationship with Father, Grandmother testified that in early 2013 Father was arrested and held in custody for physically assaulting Mother and Older Sister. While Father was in custody, Mother and daughters fled Idaho to live with Grandmother in Oregon. Grandmother helped Mother obtain a grant for victims of domestic violence to move out of Father's home. However, Mother reunited with Father after his release from custody and moved back to Idaho with Child and Younger Sister. Meanwhile, Father was under investigation for sexually abusing Older Sister. Pursuant to a no contact order between Father and Older Sister, Older Sister continued to live with Grandmother.

Grandmother did not see Child again until she took custody of her following the collision. Grandmother testified that at that time Child was fearful and scared of noises and shadows, cried often, had issues using the toilet, could not sleep by herself, woke in the night screaming, exhibited food-hiding behaviors, was very underweight, had poor dental health with unresolved cavities and abscessed teeth, and was very fearful of riding in a car. However, Child had improved greatly while in her care and no longer exhibited any behaviors of concern. Specifically, Child confidently used the toilet, finished second grade with math proficiency at a fourth grade level, had five or six good friends, was involved in sports, was regularly seeing a pediatric dentist to address dental health issues, and car trips had gotten "90% better." The only concern to which Grandmother testified was that Child refused to contact Mother despite Grandmother urging her to do so.

Originally, Mother visited Child twice a month by traveling to Oregon for one visit and having Grandmother drive Child to Idaho for the other. Grandmother testified that the Idaho trips were extremely stressful for Child, so beginning in September, 2014, Mother agreed to conduct

7

all visits in Oregon. In October 2014, Grandmother caught Mother with a twenty-four pack of beer in her hotel. Grandmother and Mother had some positive interactions, including a discussion in a later October visit where Mother admitted the April 2014 collision was her fault. Other visits involved conflicts between them. On one occasion, Mother yelled profanities at Grandmother but later apologized. On another occasion, Grandmother refused to chauffer Mother for an entire day and Mother became upset and stormed out.

Representing IDHW, Ms. Edmonson testified that, at the outset of the case plan, Mother successfully maintained housing and employment. Additionally, during visits, Mother provided Child with food, activities, and usually a gift. However, this progress was countered by Mother's failure to attend mental health treatment sessions, failure to submit to all scheduled urinalysis tests, and arrests.

Mr. Terherst, Mother's mental health counselor, identified sources of her mental health issues including physical abuse she suffered from Father, grief and bereavement related to Younger Sister's death, and complications arising from her substance dependence. Mr. Terherst testified that Mother would need at least two years of steady treatment before she would heal from these traumas.

Finally, Father volunteered to terminate his parent rights. He testified as to his belief that Mother was unaware of his sexual abuse of Older Sister although she had walked in on him with Older Sister after an episode of abuse. However, Father expressed his desire that Grandmother, not Mother, keep custody of Child.

On October 16, 2015, the magistrate court entered its order terminating Mother and Father's parental rights to Child. After reviewing the evidence, weighing witness credibility, and recognizing its discretion, the magistrate court found that clear and convincing evidence showed Mother had "neglected" Child under Idaho Code section 16-2005(1)(b) (the magistrate court terminated Father's parental rights based on his incarceration under Idaho Code section 16-2005(1)(d) and (e)). In support of its decision and concluding that Mother "continues to lack insight into how to exhibit proper parental care and control for [Child's] well-being. . . [and] continues to make destructive choices, putting herself and others at risk," the magistrate court identified the following facts: (1) Mother exposed Child to domestic violence, alcohol abuse, and instability by maintaining her relationship with Father, who had physically abused her and sexually abused Older Sister; (2) Child was malnourished and had poor dental health under

8

Mother's care; (3) the circumstances of Mother's misdemeanor DUI arrest show she drove intoxicated; (4) despite efforts to reunite Mother with Child and the terms of her bond prohibiting her from drinking, entering a bar, or driving, Mother drove to a casino where she was "obviously intoxicated"; (5) Mother battered a casino patron and violently resisted arrest; and (6) the GAIN assessment revealed that during November and December 2014, and January 2015, when Mother-Child visits were occurring, the longest period that Mother had been sober was four days. Mother appeals this order.

### III. ISSUES ON APPEAL

**1.** Did the magistrate court err in terminating Mother's parental rights?

**2.** Did the magistrate court abuse its discretion by taking judicial notice of findings entered after the adjudicatory hearing?

**3.** Did the magistrate court abuse its discretion by admitting evidence of IDHW's efforts to determine whether the Indian Child Welfare Act applied to Child?

### IV. STANDARD OF REVIEW

Due process requires that grounds for termination of parental rights be shown by clear and convincing evidence. *Dep't of Health and Welfare v. Roe*, 139 Idaho 18, 21, 72 P.3d 858, 861 (2003). A trial court's findings based on clear and convincing evidence will not be overturned on appeal unless they are clearly erroneous. *In re Crum*, 111 Idaho 407, 408, 725 P.2d 112, 113 (1986). Clear error will not be deemed to exist where findings are supported by substantial and competent evidence. *Id.* Evidence is substantial and competent if a reasonable mind could accept it as sufficient proof of some fact. *Idaho Dep't of Health and Welfare v. Doe*, 151 Idaho 356, 363, 256 P.3d 764, 771 (2011). When reviewing lower court findings, this Court takes all reasonable inferences in support of the lower court's judgment. *In re Aragon*, 120 Idaho 606, 608, 818 P.2d 310, 312 (1991). This deference is particularly important where the State seeks to terminate parental rights because the fact finder is better positioned to "observe witnesses' demeanor, to assess their credibility, to detect prejudice or motive, and to judge the character of the parties" than an independent review of a cold record. *Id.*

We review a lower court's evidentiary rulings for abuse of discretion. *Hurtado v. Land O'Lakes, Inc.*, 153 Idaho 13, 18, 278 P.3d 415, 420 (2012). Furthermore, the appellant must also show that the ruling affected a substantial right. *Id.*

### V. ANALYSIS

9

Mother challenges the sufficiency of the evidence that the magistrate found in terminating her parental rights and her conclusion that IDHW had made reasonable efforts to reunite her with Child prior to petitioning for termination of her rights. Additionally, Mother raises two separate evidentiary challenges concerning judicial notice of prior proceedings and evidence of IDHW's Indian Child Welfare Act ("ICWA") investigation respectively.

**A.  The magistrate court did not err in terminating Mother's parental rights because its findings are supported by substantial and competent evidence and IDHW had made reasonable efforts to reunify Mother and Child.**

Mother raises two arguments against the magistrate court's decision to terminate her parental rights. First, the magistrate court lacked clear and convincing evidence that Mother neglected Child. Second, the magistrate court improperly granted the petition to terminate her parental rights because IDHW failed to make reasonable efforts to reunite her with Child.

> 1.  *Mother's relationship with Father, alcohol abuse, inconsistent compliance with the case plan, and arrests, as well as Child's condition prior and subsequent to placement with Grandmother, are substantial and competent evidence that Mother neglected Child.*

A court may terminate parental rights if it finds both that termination is in the child's best interests and that the parent has neglected the child. I.C. § 16-2005(1)(b). Mother does not challenge the magistrate court's decision regarding Child's best interests. Instead, Mother points to evidence of mitigating factors to show that she did not neglect Child. For purposes of termination under Idaho's Child Protective Act, Idaho Code section 16-2002(3)(a), a child is "neglected":

> (a)  Who is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them. . .

I.C. § 16-1602(28)(a).

Mother argues that she was changing her conduct to assume parental responsibilities by attending substance abuse treatment and mental health counseling. She supports this claim by emphasizing her ability to maintain employment while downplaying her alcohol problems. Furthermore, Mother argues that the magistrate court's consideration of her continual relationship with Father effectively punishes her for suffering his physical abuse. Finally, she argues that the magistrate court improperly considered Father's sexual abuse of Older Sister because Father testified that Mother was unaware of the abuse.

10

We are not persuaded that these assertions and selective observations undermine the magistrate court's decision. To the contrary, these arguments demonstrate Mother's persistent denial of and inadequate efforts to change her destructive habits.

In support of its decision, the magistrate court emphasized that Mother's completion of the ADIS course was "vastly insufficient" to address the full extent of her alcohol dependence. Due to Mother's misleading initial self-reported substance abuse evaluation, she could not even begin considering appropriate treatment until six months into the case plan when she finally submitted to the GAIN assessment. Particularly concerning, the GAIN assessment revealed that, despite her case plan directions, Mother frequently drank to intoxication between visitations, when efforts to reunite her with Child were greatest. However, the magistrate court did commend Mother for pursuing mental health treatment and maintaining employment. Unfortunately, her alcohol fueled arrests dramatically overshadow these efforts.

Amplifying the magnitude of her poor decision making, Mother argues now that "there is nothing illegal about a person over the age of 21 consuming alcohol" and that her arrests cannot reflect on her parenting because she lacked custody at the time. First, temporary removal of a child is not a license to misbehave. Second, legal drinking age is a non-sequitur that ignores how even legal conduct may fail to meet the standard of care a parent owes her child and, while responsible drinking may not be illegal, Mother's conduct was far from responsible.

Similarly, Mother's poor decision making for Child's well-being is at the center of the magistrate court's consideration of her relationship with Father. Although Father's incarceration protects Child from continued exposure to his behavior, the magistrate court properly considered Mother's handling of his past behavior to determine her continued inability to protect Child's well-being. *In Interest of Dayley*, 112 Idaho 522, 525, 733 P.2d 743, 746 (1987). Child neglect encompasses a parent's failure to protect a child from exposure to domestic violence. *In re Doe*, 143 Idaho 343, 347, 144 P.3d 597, 601 (2006). Parents who are victims of domestic violence may face financial, housing, family, and other burdens but a child's well-being requires they be overcome. Here, after one episode of domestic violence where Father was held in custody, Mother had access to a grant that would have enabled her to shield Child from his behavior by moving out of his home. Instead, upon his release from custody, Mother reunited with Father. Furthermore, Mother's return with her children to live with Father after discovering his sexual abuse of Older Sister exemplifies Mother's inability to prioritize Child's well-being over her

11

own relationships. The magistrate court was not required to accept Father's belief that Mother was ignorant of the abuse and instead found Older Sister's testimony more credible. Mother's argument to the contrary is without merit.

In addition to Mother's alcohol abuse, arrests, and her relationship with Father, the magistrate court found Mother was inconsistent with her case plan and that Child suffered physical and mental conditions in her care. Although the magistrate court's determination of neglect is based on Mother's conduct and not failure to comply with her case plan, her missed urinalysis tests and arrests reflect her general inability to care for Child. Finally, Grandmother testified that Child's weight at birth was on the 95th percentile but when she took custody Child's weight was on the 21st percentile. Based on this and the rest of Grandmother's testimony, the magistrate court determined that Child became underweight and had poor dental health under Mother's care. Together, this evidence is substantial and competent support for the magistrate court's finding of neglect.

> 2. *Substantial and competent evidence supports the magistrate court's finding that IDHW made reasonable efforts to reunify Mother and Child.*

Mother raises three arguments in support of her claim that IDHW failed to make reasonable efforts to reunite her with Child. First, she argues the prosecutor in her criminal proceedings prevented her from pursuing substance abuse treatment when he successfully objected to her motion for furlough following her arrest at the casino. This confuses the duty of the prosecutor in her criminal proceedings with that of IDHW in the child protection proceedings. Nothing under the Child Protective Act imposes a duty on prosecutors to assist in reunification.

Second, Mother argues IDHW actively obstructed her case plan progress by first objecting to the sufficiency of her original substance abuse evaluation and ADIS course recommendation and then failing to arrange for her to receive inpatient treatment while in custody. We reject this attempt to frame IDHW's concerns and discretion regarding her case plan as obstruction. Based on its investigation and interactions with Mother, IDHW harbored substantial doubts about the adequacy of the Nimiipuu self-reported substance abuse evaluation. When Mother confessed the greater extent of her alcohol abuse, IDHW assisted her in obtaining a GAIN assessment and attempted to secure inpatient treatment at a recovery center for her. Mother's intervening conduct at the casino, which resulted in her being jailed and denied

12

furlough, cannot be construed as IDHW's failure to make reasonable efforts to reunify her with Child.

Finally, Mother argues that Child's placement with Grandmother made achieving her case plan goals more difficult because Grandmother lives approximately eight hours from her. Mother should have anticipated the potential visitation distance when she recommended that Grandmother take custody of Child. To its credit, IDHW arranged for Mother to visit Child twice a month and paid her travel expenses. Furthermore, IDHW supported Mother's treatment plan by meeting with treatment providers monthly to monitor her progress. IDHW's pursuit of adequate evaluation and treatment for Mother and its facilitation of her visits with Child are substantial and competent evidence in support of their reasonable efforts to reunify Mother and Child.

**B.     The magistrate court did not err in taking mandatory judicial notice of the adjudicatory hearing transcript.**

Mother argues that the magistrate court erred in taking judicial notice of the adjudicatory hearing transcript for purposes beyond determining jurisdiction. At the beginning of the termination trial, the Prosecutor requested judicial notice pursuant to Idaho Rule of Evidence 201; particularly,

> (b) Kinds of Facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
>
> . . .
>
> (d) When Mandatory. When a party makes an oral or written request that a court take judicial notice of records, exhibits or **transcripts** from the court file in the same or a separate case, the party shall identify the specific documents or items for which the judicial notice is requested or shall proffer to the court and serve on all parties copies of such documents or items. A court **shall** take judicial notice if requested by a party and supplied with the necessary information.

I.R.E. 201(b) and (d) (emphasis added).

Since the Prosecutor properly made an oral request that the magistrate court take judicial notice of a transcript from the court file and identified the items sought, Idaho Rule of Evidence 201(d) compelled the magistrate to take notice.

**C.     Mother fails to explain how exhibits reflecting IDHW's efforts to determine whether the Indian Child Welfare Act applied to Child affect any of her substantial rights.**

Under ICWA, if IDHW has reason to believe that a child is an Indian child, then it must notify tribes who may either assert jurisdiction or join the state case. 25 U.S.C. § 1912. During

13

the termination trial, Mother's counsel objected to the admission of exhibits numbered 4, 5, 6, and 11 through 17, on hearsay grounds. These exhibits are tribe responses to IDHW's ICWA notices. The magistrate court overruled all of these objections. Mother raises these objections again; however, she fails to identify any of her rights that these exhibits may affect or how it may have affected them. Since she has not demonstrated a substantial affect to her rights, we affirm the magistrate court's ruling without evaluating its exercise of discretion.

## VI. CONCLUSION

For the foregoing reasons, there is substantial and competent evidence supporting the magistrate court's decision to terminate Mother's parental rights. We affirm the judgment and award costs to respondents.

HORTON, J., specially concurring.

I join in the decision of the Court, save for Part V(B), relating to judicial notice of the transcript of the adjudicatory hearing. Although I concur in the result reached in that section of the Court's opinion, I cannot join in the Court's reasoning.

Rule 201, Idaho Rules of Evidence (Rule 201), "governs only judicial notice of adjudicative facts." I.R.E. 201(a).

> Black's Law Dictionary defines an adjudicative fact as "a controlling or operative fact, rather than a background fact; a fact that concerns the parties to a judicial or administrative proceeding and that helps the court or agency determine how the law applies to those parties. For example, adjudicative facts include those that the jury weighs." BLACK'S LAW DICTIONARY 610 (7th ed. 1999).

*State v. Lemmons*, 158 Idaho 971, 978, 354 P.3d 1186, 1193 (2015) (W. Jones, J., specially concurring).

Rule 201(b) describes the kind of adjudicative facts of which a court may take judicial notice: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

There is simply no basis for concluding that the transcript, in itself, constitutes an adjudicative fact. Instead, it is a verbatim account of testimony in a prior proceeding. Although the document may contain evidence from which a factual determination may be derived, the document does not, in itself, prove any particular fact. Further, this Court has no basis for deciding whether the transcript contains information "not subject to reasonable dispute," as required by Rule 201(b). That is because the transcript in question is not part of the record on

14

appeal. This comes as no surprise, as the trial judge's findings of fact and conclusions of law explicitly noted that a copy of the transcript "was not entered into evidence."

The Court's decision rests upon the mandatory language found in Rule 201(d). This begs the question, if a transcript does not constitute an adjudicative fact, what do the references to "judicial notice of records, exhibits or transcripts from the court file in the same or separate case" found in Rules 201(c) and 201(d) relate to? The answer is not to be found in the text of the Rule. Instead, it is found in the material presented to the Court prior to its amendment of the Rule in 2007. The draft amendments to the Rule, which the Court adopted without changes, were accompanied by an explanation of the purpose for the amendments. That explanation follows in its entirety:

> **Excerpt from minutes of the Appellate Rules Advisory Committee Meeting of January 19, 2007.**
>
> **"Judicial Notice**. The Office of the SAPD brought up the issue of taking judicial notice of underlying criminal files in post-conviction cases. In many cases the court is just asked or on its own takes judicial notice of the file without specifying which documents in the file are really being noticed. This presents a problem on appeal because even if the criminal case was appealed to the Supreme Court the file retained by the Supreme Court does not contain any exhibits from the criminal case. Those are returned to the district court. If the criminal case was not appealed the district court clerk is hesitant to attach the original criminal file as an exhibit to the post-conviction record. The parties should be offering documents or transcripts from the criminal case to the district court as exhibits to the post-conviction case and if it is a pro se applicant the burden is on the state to do this.
>
> The Committee decided that this was more an evidentiary problem that should be dealt with by a rule of evidence requiring that the parties shall designate what portions of the file it is requesting the court to take notice of and the court shall specify what portions of the file it is noticing. Judge Lansing, who chairs the Evidence Rules Advisory Committee, agreed to ask the members of that committee to consider an amendment and to circulate the proposal by ballot so it could be addressed in July 2007."

It is clear that the purpose of the amendment was to address a problem with the quality of the record on appeal in post-conviction relief proceedings, not to substantively modify the rule as to the types of adjudicative facts which are properly subject to judicial notice. Thus, I conclude that subsection (b) of the Rule defines the type of adjudicative facts of which a court may properly take judicial notice and subsections (c) through (g) establish the procedures governing taking judicial notice. Subsections (c) and (d) do not trump or supersede subsection (b); rather, they

15

complement subsection (b) and provide a mechanism for creating a record for appellate review when courts look to records of proceedings in the same or related cases when making a decision. For that reason, I believe that the trial court erred when it agreed to take judicial notice of the transcript for the purpose of establishing the factual basis for its earlier holding "that [Child] fell within the jurisdiction of the Child Protection Act."

I concur in the result, however, because Mother has not shown that the error relating to the transcript resulted in prejudice to a substantial right. Two aspects of Rule 103, I.R.E. are implicated by Mother's claim in this appeal. The first is Rule 103(a), I.R.E., captioned "Effect of erroneous ruling," which explicitly provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." The second aspect is Rule 103(a)(1), I.R.E., which additionally requires that "the specific ground of objection" must be specified in opposition to the admission of evidence.

The requirement that a substantial right of a party be affected as a prerequisite to a claim of error places a burden on an appellant to "present argument and authority, in their opening brief, that a substantial right has been affected by the improper admission" of evidence. *Mulford v. Union Pac. R.R.*, 156 Idaho 134, 140, 321 P.3d 684, 690 (2014) (citing *Bolognese v. Forte*, 153 Idaho 857, 866, 292 P.3d 248, 257 (2012)). The failure to advance argument and authority on the effect of a claimed evidentiary error on a substantial right results in a waiver of the claim on appeal. *Hurtado v. Land O'Lakes, Inc.*, 153 Idaho 13, 18, 278 P.3d 415, 420 (2012). Although Mother has identified an evidentiary error by the trial court, her opening brief is silent as to the impact of that error on a substantial right.

The absence of such argument is understandable. In response to the prosecutor's request that the trial court take judicial notice of the transcript, Mother's trial counsel responded: "I have no objection as to the State [sic] taking judicial notice that they found that the State had proved by a preponderance of the evidence that [Child] fell within the jurisdiction of the Child Protection Act."[1] Although the trial court then ruled that judicial notice of the transcript would be taken for purposes of establishing the facts underlying that holding, the findings of fact and

---

[1] It is evident that the trial court's determination "that the State had proved by a preponderance of the evidence that [Child] fell within the jurisdiction of the Child Protection Act" was not an "adjudicative fact" for purposes of the termination trial. That determination did not contribute to the trial court's conclusion that Mother was unable to discharge her parental responsibilities to Child and that Mother had neglected Child.

conclusions of law reflect that the trial court did not, in fact, look to the transcript for that purpose:

> An adjudicatory hearing to determine whether or not [Child] fell within the jurisdiction of the Child Protective Act was held on July 11, 2014. Following testimony of several witnesses, it was determined by a preponderance of the evidence that [Child] did fall within the jurisdiction. The State, at the beginning of the termination trial, asked the Court to take judicial notice of the findings from the adjudicatory hearing, specifically as stated in the certified transcript of that hearing from page 130, line 20 through page 136, line 8 (a transcript which was prepared for and lodged in [the criminal case], but a copy was not entered into evidence in this matter). Counsel for CASA and counsel for the father had no objection to this procedure, and counsel for mother had no objection in that by a preponderance of evidence the child was found to be within the jurisdiction of the Act. Accordingly, the Court has reviewed the transcript. . . . As a result of the adjudicatory hearing, [Child] was found to be within the jurisdiction of the Act, and was placed in the legal custody of the Department of Health and Welfare.

In short, the trial court ignored its earlier ruling and considered the transcript solely for the purpose which Mother's attorney had stipulated. In the absence of an objection to the trial court's consideration of the transcript for this purpose, the claimed error was waived.

For these reasons, I concur in the result reached by the Court in Part V(B) of its opinion.

Chief Justice J. JONES, Justices EISMANN and BURDICK CONCUR.