## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 49375

In the Matter of:
John Doe I, Jane Doe I, and John Doe II,
Children Under Eighteen (18) Years of Age.
-------------------------------------------------------

STATE OF IDAHO, DEPARTMENT OF
HEALTH AND WELFARE,

    Petitioner-Respondent,

v.

JOHN DOE (2021-54),

    Respondent-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, April 2022 Term

Opinion Filed: August 2, 2022

Melanie Gagnepain, Clerk

---

Appeal from the Magistrate Court of the Seventh Judicial District of the State of Idaho, Bonneville County. Ralph L. Savage, Magistrate Judge.

The decision of the magistrate court is <u>affirmed</u>.

Timothy D. French, Office of the Public Defender, Idaho Falls, for appellant, John Doe.

Mark V. Withers, Deputy Idaho Attorney General, Idaho Falls, for respondent, State of Idaho.

---

STEGNER, Justice.

John Doe (Father) appeals from the magistrate court's decision to terminate his parental rights to his three children: John Doe I (age 12), Jane Doe (age 11), and John Doe II (age 7). The children and their biological mother (Mother) lived in Idaho when the Idaho Department of Health and Welfare (the Department) petitioned to terminate Mother's parental rights. Mother eventually voluntarily stipulated to the termination of her parental rights. Father resided in Tennessee during these proceedings and could not be located by the Department for several months. The Department amended its original petition in Idaho to establish jurisdiction over Father. The Department then moved to obtain authorization to serve the petition on Father by publication in the Tennessee city where Father resided. The magistrate court granted the Department's request. Ultimately, Father was located in Tennessee and accepted personal service. The Department then filed a petition

seeking to terminate Father's parental rights. The matter subsequently went to trial.

Father participated in the termination trial via Zoom from Tennessee. Throughout the proceeding, Father's internet connection proved to be unreliable, and he was repeatedly disconnected from the proceeding. Father rejoined the proceeding when the connection was reestablished. Father moved to continue the trial because of the connectivity issue, which the magistrate court denied, noting that it had given the parties the option of joining the proceedings remotely, but that they were required to ensure they had a reliable internet connection. Following the trial, the magistrate court terminated Father's parental rights based on the grounds of abandonment, neglect, and the inability to discharge parental responsibilities. Father timely appealed. For the reasons discussed, we affirm the decision of the magistrate court.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In August of 2020, the Department filed a petition under the Child Protective Act against Mother regarding John Doe I, Jane Doe, and John Doe II to remove the children from Mother's custody after locating the family in a mobile home that did not have electricity or running water. After unsuccessfully working a case plan and a judicial finding of aggravated circumstances, discussed below, Mother stipulated to the termination of her parental rights for her children. At a hearing, the magistrate court accepted Mother's voluntary termination of her parental rights, finding that Mother's consent to termination was knowing, intelligent, and voluntary. The magistrate court then entered its findings, concluding that Mother had neglected the children, was unable to discharge her parental responsibilities, and that termination was in the best interests of the children.

Prior to Mother's stipulation, the Department filed a motion for a finding of aggravated circumstances and sought an order suspending visitation and reunification efforts. This motion stemmed from allegations by the children of sexual abuse voiced to their foster parents after they had been removed from Mother's care. The allegations were made against Mother, Mother's relatives, and Father, the biological father of John Doe I and John Doe II, and the legal father of Jane Doe. Specifically, Mother's oldest daughter, H.H. (age 16), whose biological father is not Father, alleged that Father had been sexually abusing her in Tennessee since she was eight years old. The magistrate court concluded that aggravated circumstances could not be determined against Father because he had not been served or notified and therefore had no opportunity to respond to allegations contained in the motion. Consequently, the magistrate court denied the Department's

2

motion without prejudice and suggested the Department serve Father and proceed accordingly if it sought to terminate his parental rights.

In the interim, the Department made efforts to locate Father, which were unsuccessful. On April 30, 2021, the Department filed a motion to serve Father by publication using a local newspaper circulated in Crump, Tennessee, Father's last known address. The magistrate court granted the motion and service by publication was completed. However, on May 27, 2021, Father accepted personal service. After he accepted service, the Department filed an amended petition under the Child Protective Act to add Father to a previously filed petition which only included Mother at the time. The Department then filed a subsequent petition to terminate Father's parental rights.

The magistrate court scheduled the termination trial to take place on September 24, 2021, noting that parties could appear by Zoom "provided [they] ha[d] a reliable internet connection for the duration of the trial." Shortly before trial, the Department filed an amended petition, including a more detailed description of the allegations against Father.

The termination trial took place as scheduled. As the magistrate court was identifying the various parties present, both in person and via Zoom, it became apparent that Father, who was participating via Zoom from Tennessee, was having connectivity issues. Counsel for Father asked the magistrate court if it could make a record of "when the connection is lost and he signs back on." The magistrate court responded to the motion, noting that it had previously cautioned Father of the need to have a reliable connection if he chose to appear remotely and the trial proceeded. After a preliminary matter was addressed, the magistrate court noted that Father had lost his connection again:

> I will note also for the record at this time that [Father] is no longer with us. I don't know when he dropped out again. He's coming on and off. So we'll let him in as soon as we can. I don't want to do the yoyo all the time, but I'll try to let you know as soon as he jumps in or when he's off, but I may not get it all the time.

The Department then presented its case, eliciting testimony from several witnesses. The first witness was David Strong, one of H.H.'s counselors, to whom she had disclosed sexual abuse by Father. As the Department called its second witness, Father's counsel inquired of the magistrate court whether Father was still connected to the Zoom call. The magistrate court informed counsel that Father was not. Father's counsel then moved for a continuance, which the magistrate court denied: "Your motion is denied. He was told he needed to get a good connection prior to, at the

3

pretrial conference. This is a civil proceeding. He does not necessarily have to be present in this proceeding. . . . So the [c]ourt will deny the motion. It's his responsibility."

The trial proceeded to the remaining witnesses: Officer Patrick Malugen with the Wayne County Sheriff's Office in Tennessee, who investigated H.H.'s allegations of sexual abuse against Father; H.H., who recounted her accusations against Father; Spencer Cook, another counselor for H.H.; Charles Brown, the Records Manager for the Department of Children's Services in Tennessee; Michael Worley, the biological father of Mother's youngest child (not subject to this case), who helped raise John Doe I, Jane Doe, and John Doe II; J.B., Father's mother; Kailee Jackson, a social worker for the Department; Makayla Gray, another social worker for the Department; and Elmer Fleischman, the guardian ad litem appointed for all three children in this case.

As Charles Brown was testifying, the Department sought to admit Exhibit 66, which consisted of numerous records from the Tennessee Department of Children's Services ("Tennessee Department") relating to Father's children as well as H.H., under Idaho Rule of Evidence 803(6), the business records exception to the rule against hearsay. Father objected, arguing that the records were prepared as part of an investigation and in anticipation of litigation. The magistrate court overruled Father's objection, finding that the records fell within the parameters of Rule 803(6).

After the Department rested, Father neither testified nor called any witnesses. The magistrate court ordered written closing arguments to be filed simultaneously. The magistrate court entered its Findings of Fact and Conclusions of Law on December 8, 2021. The magistrate court concluded that the Department had established a prima facie case of abandonment against Father, in that he had not seen the three children for well over one year and had not established any just cause for his failure. Next, the magistrate court concluded that Father had neglected the children due to his instability and unwillingness to provide proper parental care to the children. The magistrate court also concluded that Father was unable to discharge his parental responsibilities as demonstrated by his untreated substance abuse issues and "pedophilia-like characteristics." Finally, the magistrate court concluded that it was in the best interests of the children to terminate Father's parental rights, citing the risk of further sexual abuse, ongoing drug use, and the children's marked improvement during their time in foster care. Based on these findings, the magistrate entered an order terminating Father's parental rights over John Doe I, Jane Doe, and John Doe II. Father timely appealed.

## II. STANDARD OF REVIEW

> Pursuant to Idaho Code section 16-2005(1), a court may terminate parental rights if it finds that doing so is in the best interests of the child and that at least one of five grounds for termination is satisfied. The trial court must find that grounds for terminating parental rights have been proved by clear and convincing evidence. The clear and convincing evidentiary standard is met when there is evidence indicating that the thing to be proved is highly probable or reasonably certain.

> On appeal, the appellate court does not reweigh the evidence to determine if it was clear and convincing. This Court will not disturb the magistrate court's decision to terminate parental rights if there is substantial, competent evidence in the record to support the decision. Substantial, competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. This Court will indulge all reasonable inferences in support of the trial court's judgment.

*Matter of Doe I*, 166 Idaho 79, 82–83, 454 P.3d 1162, 1165–66 (2019) (quoting *Matter of Doe II*, 165 Idaho 199, 202, 443 P.3d 213, 216 (2019)).

## III. ANALYSIS

Father makes several arguments on appeal. Father first asserts that the magistrate court's judgment is void for lack of subject matter jurisdiction. Next, Father argues that the district court erred in denying his motion to continue the termination trial, in admitting Exhibit 66, and in granting the Department's motion for service by publication. Finally, Father argues there was not substantial and competent evidence to support terminating his parental rights.

### A. The magistrate court had subject matter jurisdiction.

Father alleges, for the first time on appeal, that the magistrate court lacked subject matter jurisdiction. Father's briefing on this issue is inconsequential, as it lacks a cogent argument on this point. Nevertheless, because of the fundamental nature of the rights at issue in this case, and the importance of a court properly exercising subject matter jurisdiction, we will address the merits. *See In re Termination of Parental Rts. of Doe*, 155 Idaho 896, 902, 318 P.3d 886, 892 (2014) ("Parents have a fundamental right to maintain a familial relationship, and to the 'custody, care and control' of their children; this right is protected by the Fourteenth Amendment."); *see also Allen v. Campbell*, 169 Idaho 613, 499 P.3d 1103, 1108 (2021) ("A lack of subject matter jurisdiction cannot be waived.").

Idaho Code section 16-2003 confers exclusive jurisdiction in the magistrate court "to hear petitions to terminate the parent and child relationship when the child is present in the state." I.C. § 16-2003. This jurisdiction is exclusive for the life of the case unless the magistrate court consents

to a different jurisdiction "in the best interests of the child." *Id.* A Department caseworker determined that the children were living in Idaho Falls, Idaho, on July 26, 2020. After a Shelter Care Hearing, the magistrate court concluded that it had subject matter jurisdiction over the children because they "live or were found in the state of Idaho." The magistrate court did not consent to the transfer of jurisdiction at any point during this case. Furthermore, the magistrate court also noted its jurisdiction in its findings of fact and conclusions of law. The magistrate court clearly had subject matter jurisdiction pursuant to Idaho Code section 16-2003. Father's contention that the magistrate court lacked subject matter jurisdiction is without merit and is therefore rejected.

### B. The magistrate court did not abuse its discretion in denying Father's motion to continue.

Father argues on appeal that the magistrate court abused its discretion in denying his motion to continue the trial due to Father's poor internet connection and inability to remain connected to the proceeding via Zoom. Father asserts that because he was able to appear via Zoom at two pretrial hearings with no connectivity issues, he should not have been held accountable for the unreliable connection at the termination trial. In response, the Department argues that it was Father's burden "to ensure his connection was reliable, but he failed to meet his burden." The Department further argues that because Father "chose not to use a reliable connection, chose not to testify, and chose not to present any evidence to rebut the witness['] testimony and exhibits presented by IDHW," he was not prejudiced by the magistrate court's denial of his motion to continue. Finally, the Department asserts that the magistrate court acted within its discretion in denying Father's motion.

"The decision whether to grant a motion to continue trial is within a trial court's sound discretion." *Int. of Doe I*, 166 Idaho 546, 557, 462 P.3d 74, 85 (2020) (quoting *In re Doe* (2016-31), 161 Idaho 393, 397, 386 P.3d 916, 920 (2016)) (citation omitted). In determining whether a trial court abused its discretion, this Court looks to four factors: whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

> "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances

6

present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *State v. Richardson*, 95 Idaho 446, 448, 511 P.2d 263, 265 (1973) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964)).

*Int. of Doe I*, 166 Idaho at 557, 462 P.3d at 85.

Because court proceedings via Zoom involve new technology implemented as a result of the COVID-19 pandemic, the due process implications of poor internet connectivity is an issue of first impression.[1] In one Idaho termination case that also occurred during the pandemic, a mother moved to continue her termination trial because she was residing in Georgia, purportedly due to the pandemic. *Int. of Doe I*, 168 Idaho 105, 108, 480 P.3d 143, 146 (Ct. App. 2020). The mother alternatively moved to be allowed to appear and testify by video. *Id.* The magistrate court denied the mother's motion to continue but allowed her to testify by video pursuant to Idaho Rule of Civil Procedure 7.2(a)(2) pursuant to the parties' stipulation. *Id.* (Idaho Rule of Civil Procedure 7.2(a)(2) provides: "Hearings Allowed. The court may hold hearings by telephone or video teleconference on the following: . . . (2) any evidentiary hearing, when no oral testimony is to be introduced at the hearing, except the court may allow testimony by video teleconference if the parties stipulate[.]") On appeal, the Idaho Court of Appeals concluded that the mother failed to "articulate any abuse of discretion, [failed to] identify any factors weighing in favor of continuing the termination hearing indefinitely or otherwise, [failed to] assert any due process violation, and [failed to] identify any prejudice resulting from the denial of her motion." *Id.* at 109, 480 P.3d at 147. As a result, the Court of Appeals held that the magistrate court did not abuse its discretion in denying her motion to continue. *Id.*

In this case, the magistrate court allowed Father to appear via Zoom since his place of residence was Tennessee. Prior to trial, the magistrate court drafted a scheduling order, which allowed parties to appear via Zoom "as long as they use a reliable connection that includes their appearing via video." Similarly, the summons sent to Father prior to trial stated: "You are allowed

---

[1] The Idaho Supreme Court issued a number of emergency orders throughout the pandemic modifying court procedures. The order in effect at the time of Father's termination trial provided that "[a]ll trials on a petition to terminate parental rights shall be held in person." *Order*, September 22, 2021. However, the magistrate court's scheduling order authorized parties located outside of Idaho (i.e., Father) to appear via Zoom: "The trial will be conducted in person. However, to the extent any parties or witnesses are appearing from outside the state of Idaho, they are authorized to appear via Zoom as long as they use a reliable connection that includes their appearing via video." Father has not challenged his appearance via Zoom other than by appealing the magistrate court's decision to deny his motion to continue. Consequently, Father has forfeited any challenge to the magistrate court's authorization allowing him to appear at the termination trial via Zoom.

to appear by Zoom at the trial provided you have a reliable internet connection for the duration of the trial." Father also appeared via Zoom at two pretrial hearings, apparently with no issue.

On appeal, Father acknowledges that a decision on a motion to continue is within the magistrate court's discretion. Father also sets out the four-part test we articulated in *Lunneborg*. However, Father's briefing on appeal does not address *how* the magistrate court abused its discretion. Furthermore, Father does not allege any prejudice he sustained as a result of his connectivity issues. As noted by the Department, Father chose not to testify or present any evidence to rebut the Department's case. He was also represented by counsel throughout the proceeding. Like the mother in *Doe I*, Father has not specifically asserted prejudice or supporting authority that the magistrate court abused its discretion. Consequently, Father has failed to establish error on the part of the magistrate court.

### C. The magistrate court did not err in admitting Exhibit 66.

Father next argues on appeal that the magistrate court erred by admitting Exhibit 66. Exhibit 66 consists of 544 pages of records prepared by the Tennessee Department. These records were created as a result of 66 referrals and approximately 20 investigations of the family while they resided in Tennessee from 2006 to 2018. At trial, the Department sought to admit Exhibit 66 through Charles Brown, the Records Manager of the Tennessee Department. The Idaho Department moved to admit the exhibit. Father's counsel objected, arguing that it was hearsay and did not fall within the business records exception. The magistrate court concluded that Exhibit 66 was admissible as a business record:

> This is a civil case. It's not a criminal case. This is similar to a corporation, for instance, that would keep records as to investigating various things that occur with how they conduct business. . . . In this instance, I understand the records were kept. Although I have not had a chance to look at them and maybe if I looked at them, I would come to a different conclusion. But this is records of the Department of Children's Services in Tennessee of their activity with regard to these children. So that meets the test for it being a regular activity.

Importantly, in its decision, the magistrate clarified that it was only considering Exhibit 66 regarding "actions taken by the [Tennessee] Department of Children's Services and statements of [Father] to the investigators."

On appeal, Father argues that the "investigative records of the Department of Children's Services in Tennessee are all [prepared] in anticipation of litigation."

"This Court reviews challenges to the district court's evidentiary rulings under the abuse

8

of discretion standard." *Phillips v. E. Idaho Health Servs., Inc.*, 166 Idaho 731, 741, 463 P.3d 365, 375 (2020). Idaho Rule of Evidence 803(6) provides that business records are not subject to the rule against hearsay if the following conditions are met:

> (6) Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if:
>
>> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>>
>> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>>
>> (C) making the record was a regular practice of that activity;
>>
>> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12); and
>>
>> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

I.R.E. 803(6).

"This Court has established that '[t]he general requirement for admission under I.R.E. 803(6) is that the document be produced in the ordinary course of business, at or near the time of occurrence and not in anticipation of trial.'" *State v. Cunningham*, 164 Idaho 759, 764, 435 P.3d 539, 544 (2019) (quoting *Portfolio Recovery Associates, LLC. v. MacDonald*, 162 Idaho 228, 233, 395 P.3d 1261, 1266 (2017)). These elements indicate "the degree of trustworthiness necessary to justify an exception to the rule against hearsay." *Id.* (quoting *Hurtado v. Land O'Lakes, Inc.*, 147 Idaho 813, 815, 215 P.3d 533, 535 (2009)).

> Generally, business records are presumed reliable because (1) businesses depend on such records to conduct their own affairs; accordingly, the employees who generate them have a strong motive to be accurate; and (2) routine and habitual patterns of creation and retention lend reliability to business records. 7 Michael H. Graham, *Handbook of Federal Evidence* § 803:6 (8th ed. 2018). "More specifically, the reliability of business records is supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, and/or by a duty to make an accurate record as part of a continuing job or occupation." *Id.* However, when a document is created for a particular use that lies outside the usual operations of the business—especially when that use involves litigation—none of these justifications for admission hold true. *United States v. Blackburn*, 992 F.2d 666, 670 (7th Cir. 1993).

*Id.*

Federal Rule of Evidence 803(6) contains substantially similar language to that of Idaho

Rule of Evidence 803(6). *See* F.R.E. 803(6); I.R.E. 803(6). As noted by Wright & Miller, the "exclusion of litigation-minded records can be grounded not in Rule 803(6)(B) and (C)'s requirement that the record must be kept and made 'in the course of a regularly conducted activity,' but rather in Rule 803(6)(E)'s general requirement of trustworthiness." Wright & Miller, § 6865 *Anticipation of Litigation*, 30B FED. PRAC. & PROC. EVID. (2022 ed.). "Enforcement through 803(6)(E) would result in case-by-case analysis of a particular record's trustworthiness. This would mean that some trustworthy business records could be admitted under Rule 803(6) even if created in a litigation context." *Id.*; *see also In re Termination of Parent-Child Relationship of E.T.*, 808 N.E.2d 639, 644 (Ind. 2004) (distinguishing between facts observed by social workers in routine reporting and opinions on an ultimate issue; discussing the importance of subjecting an opining witness to cross-examination).

The magistrate court did not err in its limited consideration of Exhibit 66. First, and most importantly, the magistrate court only considered select portions of the voluminous exhibit. The records considered by the magistrate court involved two topics. As noted by the magistrate court, it only considered Exhibit 66 for "[1] actions taken by the [Tennessee Department] and [2] statements of [Father] to the investigators." The actions taken by the Tennessee Department were imposed by statute. As a result, it was appropriate for the magistrate court to consider them since they were presumably trustworthy. The trial judge was not obliged to rely on the Tennessee Department's actions, but he was not precluded from doing so. In addition, the magistrate court also limited its consideration of Exhibit 66 to statements made by Father during those investigations. Idaho Rule of Evidence 801 defines statements of an opposing party as nonhearsay. I.R.E. 801(d)(2). As such, the magistrate court was entitled to consider and rely on statements attributed to Father. The magistrate court, by narrowing its review of the records to two topics, significantly limited the scope of the exhibit.

Additionally, Charles Brown, the records manager at the Tennessee Department, testified at trial that the records contained in Exhibit 66 were prepared in the ordinary course of business of the Tennessee Department. Furthermore, Brown testified that the Department utilized "a case management system called TFACTS that tracks all our cases. . . . That system has certain rights that only allows certain persons, based on their job function, access to the system. It tracks changes they make and it's secure." A review of the 544-page exhibit itself shows the technical nature of the records kept by the Tennessee Department. Each document begins with the case identification

number, the case name, the status of the case, and other technical information. There is a place for a narrative to be entered that also records who entered the narrative comments and on what date.

Father has not argued on appeal, nor did he argue at trial, that Exhibit 66 "indicate[s] a lack of trustworthiness." I.R.E. 803(6)(E). Brown's testimony at trial satisfies the elements of Rule 803(6) for records of regularly conducted business activity. We note that not all case information records will, as a matter of course, be admitted into evidence as business records. However, when those records indicate trustworthiness and reliability, such records may be admitted under Rule 803(6). In this instance, the Tennessee Department's records have many indicia of reliability and trustworthiness. First, Brown testified that the TFACTS system monitored which users could access certain files and what changes could be made to those files. Second, a large portion of the records contained H.H.'s allegations of sexual abuse by Father. Importantly, H.H. testified at trial and was subject to cross-examination. *See In re E.T.*, 808 N.E.2d 639, 644. Third, there is also no evidence that these records were created for any special or different purpose than all other records created by the Tennessee Department. For these reasons, we conclude that the magistrate court did not abuse its discretion in admitting Exhibit 66 and limiting it in the way that the magistrate court did.[2]

### D. The magistrate court did not err in granting the Department's motion for service by publication.

After attempting to locate Father for several weeks, the Department moved for service by publication. The magistrate court granted the motion and ordered service by publication in *The Courier*, "a newspaper in general circulation in the Crump, Tennessee area." The publication was in circulation from May 6, 2021, through May 13, 2021. On May 27, Father formally accepted personal service.

On appeal, Father argues that the Department failed to exercise due diligence in determining his location. Father cites a case describing the parameters of due process but provides no argument as to how his due process rights were violated by his being served by publication.

---

[2] Although not necessary for our conclusion that Exhibit 66 was properly admitted, we also note that Father, while challenging Exhibit 66's admission, does not assert that the admission of the records affected his substantial rights. *See In re Doe*, 160 Idaho 154, 165, 369 P.3d 932, 943 (2016) (Horton, J., specially concurring) ("The failure to advance argument and authority on the effect of a claimed evidentiary error on a substantial right results in a waiver of the claim on appeal.").

11

"An issue is moot if it presents no justiciable controversy and a judicial determination will have no practical effect upon the outcome. Mootness also applies when a favorable judicial decision would not result in any relief." *Frantz v. Osborn*, 167 Idaho 176, 180, 468 P.3d 306, 310 (2020) (citations and quotations omitted).

We note that Father's briefing on appeal lacks any cogent argument regarding service by publication. As a result, we decline to address this claim. However, it should also be noted that Father's objection to being served by publication is moot. Father accepted personal service and appeared via Zoom at the termination trial. Therefore, Father suffered no prejudice from being served by publication prior to his actual acceptance of service.

**E. The magistrate court did not err in terminating Father's parental rights.**

The magistrate court concluded that clear and convincing evidence supported termination of Father's parental rights. The magistrate court concluded that three grounds existed to support terminating Father's parental rights. First, the magistrate court concluded that Father had abandoned his children by failing to maintain any contact with them for over one year. (By the time of trial in September 2021, Father had not had any contact with the children since "mid-2018.") Because Father had not provided any "just cause" for why he had not had any contact with the children for over one year (actually over three years), the magistrate court concluded that "the prima facie burden has been met and it can be concluded that [Father] has abandoned his children."

Next, the magistrate court concluded that there was "substantial evidence of neglect in this matter which has been proven by clear and convincing evidence." To support this conclusion, the magistrate court pointed to Father's failure to provide any parental care or financial support to the children, Father's failure to address ongoing substance abuse issues, his multiple periods of incarceration, and his failure to maintain stable employment.

Finally, the magistrate court concluded that Father was unable to discharge his parental responsibilities because of his "pedophilia-like characteristics" (the magistrate court had previously concluded that Father had sexually abused H.H.) and his failure to address his housing situation or lack of financial resources. The magistrate court also concluded that Father's inability to parent "will continue for an indefinite period of time in the future."

After finding three grounds to support termination, the magistrate court then concluded that termination was in the best interests of the children for several reasons. First, the magistrate court noted that "the evidence concerning the best interests of the children is so substantial it is

12

beyond a reasonable doubt that it is in the best interests of these children that [Father's] parental rights be terminated." To support this conclusion, the magistrate court noted that Father's "sexual tendencies pose an unacceptable risk to the children." Additionally, the court pointed to Father's previous domestic violence toward family members, his lack of a safe and stable home, and his ongoing drug use. The court also acknowledged that the children were "thriving" in their foster care placements and that the children's biological mother's parental rights had also been (voluntarily) terminated.

On appeal, Father argues that the magistrate court lacked substantial and competent evidence to establish grounds for termination. Father disputes each ground upon which the magistrate court based its termination: abandonment, neglect, and the inability to discharge his parental responsibilities. Father also argues that the magistrate court abused its discretion when it decided that termination was in the best interests of the children. Father's claims of error will be addressed in turn.

Idaho Code section 16-2005 provides the specific grounds upon which the court may terminate a parent's rights. It provides:

> (1) The court may grant an order terminating the relationship where it finds that termination of parental rights is in the best interests of the child and that one (1) or more of the following conditions exist:
>
>> (a) The parent has abandoned the child.
>>
>> (b) The parent has neglected or abused the child.
>>
>> (c) The presumptive parent is not the biological parent of the child.
>>
>> (d) The parent is unable to discharge parental responsibilities and such inability will continue for a prolonged indeterminate period and will be injurious to the health, morals or well-being of the child.
>>
>> (e) The parent has been incarcerated and is likely to remain incarcerated for a substantial period of time during the child's minority.

I.C. § 16-2005(1)(a)–(e).

Importantly, at least one ground for termination must be coupled with a finding that termination is also in the best interests of the child. *Id.* "Once a statutory ground for termination has been established, the trial court must next determine whether it is in the best interests of the child to terminate the parent-child relationship. When considering the best interests of the child, a trial court may consider numerous factors." *In re Doe*, 159 Idaho 192, 198, 358 P.3d 77, 83 (2015) (quoting *In re Doe*, 157 Idaho 765, 772, 339 P.3d 1169, 1176 (2014)). Some factors the trial court

may consider include: a "parent's history with substance abuse, whether the parent has provided financial support, the child's relationship with those currently caring for him or her and whether the child has improved under that care, the child's need for stability and certainty, and the parent's incarceration." *Id.*

       1.  <u>The magistrate court did not err in concluding that Father abandoned his children.</u>

Regarding abandonment, Father acknowledges that failing to maintain any contact with a child for more than one year without just cause is prima facie evidence of abandonment. However, Father asserts that "the burden of persuasion of abandonment remains with the petitioner who seeks to terminate the parent-child relationship." Father next contends that "[w]ithout testimony or other evidence specifically providing the court with information that [Father] had actual knowledge of the location of his children, there can be no finding of abandonment."

In response, the Department points to a myriad of evidence demonstrating that Father abandoned the children, including that while the children resided with Father's mother (their paternal grandmother), Father provided no financial support and did not maintain a normal parental relationship with the children. Additionally, the Department points to the caseworkers' testimony that Father never visited the children after they moved to Idaho. Finally, the Department notes that Father failed to show just cause for abandoning his children and failed to present evidence rebutting the prima facie evidence of abandonment.

Idaho Code section 16-2002 provides that abandonment occurs when "the parent has willfully failed to maintain a normal parental relationship including, but not limited to, reasonable support or regular personal contact. Failure of the parent to maintain this relationship without just cause for a period of one (1) year shall constitute prima facie evidence of abandonment under this section[.]" I.C. § 16-2002(5).

> When a parent fails to maintain a normal parental relationship without just cause for a period of one year, prima facie evidence of abandonment exists. There is no universal standard for what constitutes a normal parental relationship, and whether such a relationship exists depends on the facts and circumstances of each case. The burden of persuasion is on the petitioner to demonstrate that the defendant lacks a normal parental relationship with the child and that there is no just cause for the failure to maintain such a relationship. If the petitioner is able to meet this burden, the defendant then has the burden of production to present evidence of just cause. If the magistrate court finds that just cause has not been established, the petitioning party has met its burden of persuasion.

*Doe v. Doe*, 150 Idaho 46, 50, 244 P.3d 190, 194 (2010) (citations omitted).

14

Here, there is substantial and competent evidence that Father abandoned his children. First, the magistrate court concluded that Father knew his children had relocated to Idaho. Substantial and competent evidence supports that finding. After Mother and the children moved to Idaho and were living with Mother's boyfriend, Father sent a nude photo of himself to Mother's boyfriend via Facebook. Father's interaction with Mother's boyfriend, while the family lived in Idaho, establishes his knowledge of their whereabouts. Next, it was established at trial that Father had not seen the children since spring or summer of 2018, well over three years at the time of trial. (The statute only requires that it be over one year.) Further, Father did not attempt to communicate with the children via cards, letters, or gifts. The Department demonstrated at trial that Father failed to maintain a normal parental relationship with his children for over one year. This constitutes prima facie evidence of abandonment. As such, Father was entitled to present evidence that he had just cause for his failure to maintain such a relationship. Father did not do so. Father presented no evidence at trial, let alone any evidence justifying his lack of parental care or interaction with his children for more than two years. As such, the magistrate's conclusion that there was no just cause for Father's failure to see his children is supported by substantial and competent evidence.

2. The magistrate court did not err in concluding that Father neglected his children.

Father next challenges the magistrate court's conclusion that he neglected his children. However, Father's brief lacks any cogent argument or authority challenging a finding of neglect or the facts that the magistrate court relied upon in finding neglect. Instead, Father's briefing refers to the due process rights of parents facing termination of a fundamental right. Father asserts that he was "denied due process and a fair hearing under the Fifth, Sixth, and Fourteenth Amendment to the United States Constitution." Despite this contention, Father does not describe how his due process rights were violated or how such a violation relates to the magistrate court's finding of neglect.

In response, the Department recounts the various findings of the magistrate court supporting neglect, including Father's near complete abdication of his parental role, his drug use, his unwillingness to provide a safe home for the children, and his prior criminal and sexually abusive conduct. The Department asserts that the magistrate court did not abuse its discretion in concluding that Father neglected his children.

Neglect is defined in Idaho Code section 16-1602(31) as a child

(a) Who is without proper parental care and control, or subsistence, medical or other

15

care or control necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them [sic]; however, no child whose parent or guardian chooses for such child treatment by prayers through spiritual means alone in lieu of medical treatment shall be deemed for that reason alone to be neglected or lack parental care necessary for his health and well-being, but this subsection shall not prevent the court from acting pursuant to section 16-1627, Idaho Code; or

(b) Whose parent, guardian or other custodian is unable to discharge the responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being; or

(c) Who has been placed for care or adoption in violation of law; or

(d) Who is without proper education because of the failure to comply with section 33-202, Idaho Code.

I.C. § 16-1602(31).

Irrespective of Father's failure to properly challenge the neglect finding on appeal, we nevertheless conclude that the magistrate court did not err in concluding that Father had neglected his children. As discussed above, more than ample evidence was presented at trial concerning Father's complete lack of interest in maintaining a normal parental relationship with his children. Father never demonstrated an interest in acting as a parental figure to his children, as shown by his absence for most of their lives, being in and out of prison or jail, his lack of financial support for the children,[3] and his continued mental health and substance abuse issues. As such, we conclude that the magistrate court's finding that Father neglected his children was based on substantial and competent evidence.

> 3. <u>The magistrate court did not err in concluding that Father was unable to discharge his parental responsibilities.</u>

Father also claims that the magistrate court erred when it determined that he was unable to discharge his parental responsibilities. Father argues that he was never given the opportunity to participate in a case plan with the Department. "Clearly, developing a case plan that allowed [Father] to participate and interact with the Idaho Department of Health and Welfare would have afforded Appellant an opportunity to work for reunification, but it also would have provided the

---

[3] The magistrate court included the following factual finding its order terminating Father's parental rights:

> [Father] did not send any money to assist the children. However, [Mother] sporadically received approximately $40 from the State of Tennessee. It is unclear what this money was for, i.e. child support or some kind of support payment because [Father] was incarcerated. When the children were with [J.B., their paternal grandmother,] she indicated that [Father] never had money to take care of the children. He never came to any of the birthday parties and he did not help with Christmas.

Department with the opportunity to assess [Father] and his ability to parent."

In response, the Department notes that Father failed to engage with the Department even after he accepted service. The Department further points out that Father knew his children were in Idaho and failed to contact them. Finally, the Department notes that "the grounds for termination did not include a failure to comply with a case plan." "In short," the Department contends, "a parent cannot intentionally abandon his children for years and then surface shortly before the termination hearing with an expectation that he will be treated as if he had not abandoned the children."

It should be noted that the failure to comply with or complete a case plan can be a separate ground supporting termination. *See* I.C. § 16-2002(3)(b). Importantly here, the magistrate court did not rely on such a ground to support termination of Father's parental rights. Instead, the magistrate court based its decision on Father's "pedophilia-like characteristics," his financial instability, and his failure to address his substance abuse issues. Furthermore, Kailee Jackson, one of the caseworkers on Father's case, testified that the Department does not develop case plans for parents. Instead, Jackson testified, "[t]hey're the ones that develop [a case plan] with us. We can't develop it for them." Jackson further testified that Father did nothing to develop a case plan with her. Mikayla Gray, another caseworker, testified that the Department did not create a case plan with Father: "Like I said, communication has not been consistent with him and him being responsive to us. We do create case plans with the parents. We can't create the case plan for them. They have to assist." It is apparent that Father, even once he accepted service, failed to maintain regular contact with the Department, let alone enough contact to develop a case plan. The burden was on Father, not the Department, to spearhead a reunification case plan; he did not do so.

Regardless, we conclude that the magistrate court did not err in finding that Father was and would be unable to discharge his parental responsibilities. Idaho Code section 16-2005 allows for termination upon a finding that "[t]he parent is unable to discharge parental responsibilities and such inability will continue for a prolonged indeterminate period and will be injurious to the health, morals or well-being of the child." I.C. § 16-2005(1)(d). The evidence showed, and the magistrate court found, that Father had sexually abused H.H. (a half-sister to the children involved in this case) for several years, that Father admitted to being a "sexual freak," and that Father had a preference for younger women and girls. As a result, the magistrate court concluded that Father posed an unacceptable risk to his three children. Even if Father began to address this, the magistrate

17

court concluded that Father's inability to parent would continue for an indefinite period. We agree with the magistrate court's conclusions. Father's behavior would certainly be injurious to the health and well-being of his children. Further, Father demonstrated no interest in seeking treatment or a different living situation that would enable him to adequately care for the children. Therefore, the magistrate court's determination that Father was unable to discharge his parental responsibilities is supported by substantial and competent evidence.

4. <u>The magistrate court did not err in concluding that termination of Father's parental rights was in the best interests of the children.</u>

Finally, Father contends that the magistrate court abused its discretion when it determined that termination was in the best interests of the children. The only argument Father advances on this point is that the magistrate court relied too heavily on H.H.'s testimony regarding Father's sexual abuse of her. Father points to the fact that H.H. also faced abuse from her mother and that her allegations against Father have thus far gone uncharged in Tennessee.

The Department responds by listing a number of Father's shortcomings as a parent. Specifically, regarding the children's best interests, the Department notes the children's need for permanency and stability, which Father either cannot or will not provide. The Department emphasizes that the children have each improved in foster care and have bonded with their respective foster families. The Department argues that the magistrate court did not abuse its discretion in determining, by clear and convincing evidence, that it would be in the best interests of the children to terminate Father's parental rights.

A trial court may consider multiple factors in determining whether termination is in the best interests of a child. *In re Doe*, 156 Idaho at 111, 320 P.3d at 1270. The magistrate court set forth these factors extensively before concluding that termination of Father's parental rights was in the best interests of the children "beyond a reasonable doubt." (It should be noted the magistrate court found this fact by an even greater standard than that required by statute.) The magistrate court acknowledged Father's reprehensible conduct, including sexual abuse and pedophilic predispositions, physical abuse, drug use, as well as his inability to provide a safe and stable home and financially provide for his children. These behaviors were established without contradiction at trial. The magistrate court's determination was based on substantial and competent evidence; consequently, the magistrate court did not err in concluding that terminating Father's parental rights was in the best interests of the children.

## IV.    CONCLUSION

Based on the foregoing, we affirm the decision of the magistrate court terminating Father's parental rights regarding John Doe I, Jane Doe and John Doe II.

Chief Justice BEVAN, Justices BRODY, MOELLER and ZAHN CONCUR.