## IN THE SUPREME COURT OF THE STATE OF IDAHO

### Docket No. 36761

| | | |
|---|---|---|
| IN THE INTEREST OF: JANE DOE, A MINOR CHILD UNDER 18 YEARS OF AGE (2009-12). | ) ) ) | Boise, June 2010 Term |
| ------------------------------------------------------- | ) | |
| JOHN DOE and JANE DOE I, | ) | 2010 Opinion No. 70 |
| | ) | |
| Plaintiffs-Respondents, | ) | Filed: June 28, 2010 |
| | ) | |
| v. | ) | Stephen Kenyon, Clerk |
| | ) | |
| JOHN DOE I, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Appeal from the District Court of the First Judicial District of the State of Idaho, Bonner County. Hon. Debra A. Heise, Magistrate Judge.

The decision of the magistrate court is affirmed.

Isabella Robertson, Bonner County Public Defender, Sandpoint, for appellant.

Mark R. Iverson, Spokane, Washington, for respondents.

Submitted on the briefs.

_____

HORTON, Justice

This case involves the termination of John Doe I's (Father) parental rights. Father is the unmarried biological father of a minor child (GP). GP's biological mother, Jane Doe I (Mother), together with her unmarried partner, John Doe (Step-Father), seek to terminate Father's parental rights in order to permit Step-Father to adopt GP. They argue that Father abandoned GP and, in the alternative, Father's consent was not required for Step-Father's adoption of GP as Father's parental rights never ripened. The magistrate judge found that Father had abandoned GP and terminated his parental rights. Father now appeals. We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Father and Mother met in 2004 and began living together in April, 2005. During that period, Mother became pregnant with GP. In July, 2005, Father's substance abuse and emotional

- 1 -

instability led to a self-described breakdown. When Mother attempted to end the relationship, Father began stalking Mother, which led to entry of a no contact order. Father's conduct eventually resulted in misdemeanor convictions for Second-Degree Stalking and Violation of a No Contact Order, for which he was placed on supervised probation. During Mother's pregnancy, Father was involuntarily committed and, following his release, again hospitalized for psychiatric treatment.

GP was born in 2006. Father has never met or seen GP. Father was aware of GP's birth, but did not go to the hospital because of the existence of the no contact order. After GP's birth, Father had difficulties with probation, including failing a drug test. In April, 2006, Father finally began to address his substance abuse issues and in May, 2006, he entered and completed an in-patient treatment program. Although he had a relapse following the death of his father, he has not used alcohol since 2008 or drugs since April, 2006.

During Mother's pregnancy she met and began dating Step-Father. Since GP's birth, Mother and Step-Father have lived together and have been GP's care-givers.

Father has testified that he contacted an attorney to seek custody of GP but that the attorney requested a $5,000 retainer that he could not afford. He has not filed a voluntary acknowledgement of paternity with the Idaho Department of Health and Welfare. Although he testified that he filed a petition to establish paternity in 2008, the magistrate court was unable to locate a case in Bonner County or in the ISTARS (Idaho Statewide Trial Court Automated Records System) repository in which Father is named as a petitioner or plaintiff. Father also testified that he attempted to send two $200 checks to the Department of Health and Welfare but those checks were returned as there was no account to which they could apply the checks.

In November, 2008, social worker Kristina Brennan conducted a home study for GP's potential adoption by Step-Father. She found that Step-Father had no criminal history and none of the references Ms. Brennan contacted had any reservations about Step-Father adopting GP. She testified that GP's adoption would provide a sense of permanency, that she saw no detriment to the adoption, and that because Step-Father was the only father figure GP has ever known, that adoption would be in GP's best interests. However, Brennan testified that she did not know anything about Father; rather, her role was simply to evaluate Step-Father's suitability as an adoptive parent.

On October 10, 2008, Step-Father filed a petition for the termination of Father's parental rights. The petition acknowledged that Father was GP's biological father. Mother was later joined as a party to the proceedings. Trial was scheduled for April 20, 2009. On April 13, 2009, the magistrate court held a final pre-trial conference. At that time, the court ordered that all prospective witnesses and exhibits be disclosed by April 15, 2009. On April 19, 2009, counsel for Father filed a motion for a continuance alleging that the testimony of Kristina Brennan was "inherently biased" and sought the appointment of a guardian ad litem. The magistrate judge denied the motion as untimely.

The trial took place on April 20 and 29, 2009. At the opening of the second day, counsel for Father faxed the magistrate court a witness list indicating the intention to call a previously undisclosed expert witness to testify about Father's mental health issues. Counsel for Father argued that, because earlier testimony discussed Father's mental health and because of the constitutional dimensions of a termination of parental rights, the expert should be permitted to testify despite the late notice. The magistrate judge excluded the testimony as untimely and noted that the only reason that a second day of trial was required was that all of the scheduled witnesses could not be heard on the first day.

On June 29, 2009, the magistrate court entered a Memorandum Decision, Order and Judgment terminating Father's parental rights.[1] The magistrate judge found that it was undisputed that Father had not had contact with GP, nor had he ever provided any support for her, and that Father's mental health and substance abuse issues did not constitute just cause that justified his failure to develop a parent-child relationship. This, the magistrate judge found, constituted abandonment as defined by I.C. § 16-2002. The magistrate judge further found that termination of Father's parental rights was in GP's best interests, reasoning that Step-Father's adoption "will provide her with the continued stability of a loving an [sic] intact relationship with [Step-Father] as a father figure." Based upon these findings, the magistrate court terminated Father's parental rights. Father timely appealed.

## II. STANDARD OF REVIEW

In reviewing a termination of parental rights, this Court "'reviews the trial court (magistrate) record to determine whether there is substantial and competent evidence to support

---

[1] Notably this did not comply with I.R.C.P. 58(e)'s requirement that a judgment "be set forth on a separate document." However, the document does purport to be a judgment and "set[s] forth the relief to which the party was entitled." *Spokane Structures, Inc. v. Equitable Inv., LLC*, 148 Idaho 616, 620, 226 P.3d 1263, 1267 (2010).

the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings.'" *Doe v. State*, 137 Idaho 758, 759-60, 53 P.3d 341, 342-43 (2002) (*Nicholls v. Blaser*, 102 Idaho 559, 561, 633 P.2d 1137, 1139 (1981)). "Substantial competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Doe*, 146 Idaho 759, 761, 203 P.3d 689, 691 (2009) (internal quotations omitted). "'[T]his Court will indulge all reasonable inferences in support of the trial court's judgment' when reviewing an order that parental rights be terminated." *In re Aragon*, 120 Idaho 606, 608, 818 P.2d 310, 312 (1991) (quoting *In re Castro*, 102 Idaho 218, 221, 628 P.2d 1052, 1055 (1981)).

In determining whether the trial court has abused its discretion, this Court determines

"(1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason."

*Baxter v. Craney*, 135 Idaho 166, 169, 16 P.3d 263, 266 (2000) (citing *Sun Valley Shopping Ctr., Inc. v. Idaho Power Co.*, 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991)).

### III. ANALYSIS

On appeal, Father raises four issues that are broadly divisible into 1) issues relating to the magistrate court's termination of parental rights; and 2) issues relating to the magistrate court's discretionary rulings. Mother raises an additional issue on appeal, arguing that, even if the termination did not comply with I.C. § 16-2005, Father has not complied with I.C. § 16-1504 and that, consequently, Father had no parental rights with regard to GP that could be terminated. The issues are addressed in that order.

**A. The magistrate court's findings justifying the order terminating parental rights are supported by substantial and competent evidence.**

Idaho Code § 16-2005, governing the conditions for termination of parental rights, states:

The court may grant an order terminating the relationship where it finds that termination of parental rights is in the best interests of the child and that one (1) or more of the following conditions exist: (a) The parent has abandoned the child. (b) The parent has neglected or abused the child. (c) The presumptive parent is not the biological parent of the child. (d) The parent is unable to discharge parental responsibilities and such inability will continue for a prolonged indeterminate period and will be injurious to the health, morals or well-being of the child. (e) The parent has been incarcerated and is likely to remain incarcerated for a substantial period of time during the child's minority.

I.C. § 16-2005(1). As the text indicates, this requires two findings: first, that one of the statutory bases for termination is shown and, second, that termination of parental rights is in the best interests of the child. *In re Aragon*, 120 Idaho at 611, 818 P.2d at 315. The magistrate court found that Father had abandoned GP, satisfying I.C. § 16-2005(1)(a), and that terminating his parental rights was in GP's best interests. On appeal, Father argues that both findings were in error.

Abandonment is defined by I.C. § 16-2002, which states:

"Abandoned" means the parent has willfully failed to maintain a normal parental relationship including, but not limited to, reasonable support or regular personal contact. Failure of the parent to maintain this relationship without just cause for a period of one (1) year shall constitute prima facie evidence of abandonment under this section; provided however, where termination is sought by a grandparent seeking to adopt the child, the willful failure of the parent to maintain a normal parental relationship as provided herein without just cause for six (6) months shall constitute prima facie evidence of abandonment.

I.C. § 16-2002(5).

The petitioner holds and retains the burden of persuasion to show that abandonment has occurred. This includes a showing that the defendant parent is without just cause for not maintaining a normal relationship with the child. If the petitioning party makes the prima facie case, then the defendant parent holds the burden of production to present evidence of just cause. If the trier of fact finds that there are no valid defenses or "just causes," then the petitioning party has met the burden of persuasion.

*In re Adoption of Doe*, 143 Idaho 188, 192, 141 P.3d 1057, 1061 (2006) (internal citations omitted).

In support of the finding of abandonment, the magistrate court noted that "it is undisputed that [Father] has had no contact whatsoever with [GP], nor has he provided any financial support for [GP]." This finding is not disputed on appeal. Rather, Father argues that because Mother had a no contact order he could not see GP and, because he was undergoing psychological and drug treatment, he could not contribute to GP's upbringing. This, he argues, constitutes just cause for his failure to establish a parent-child relationship. Father argues that his case is akin to those presented in *Doe v. State*, 137 Idaho 758, 53 P.3d 341 (2002), and *Hopper v. Hopper*, 144 Idaho 624, 167 P.3d 761 (2007). However, both of the cited cases are distinguishable from Father's situation.

*Doe v. State* involved an incarcerated father who made a number of attempts to contact his child. 137 Idaho at 759, 53 P.3d at 342. As the magistrate judge noted in this action, there

was nothing that prevented Father from making some attempt to develop a parent-child relationship with GP.

> [B]etween the fall of 2007, when [Father] testified that he achieved stability, and the date of this action, there is no evidence that [Father] provided [GP] with any type of support either emotionally or financially other than a self-reported visit to an unnamed attorney on an unspecified date to determine his legal options and the mailing of two $200 checks on unspecified dates to the Department of Health and Welfare.

This is markedly different from the various ways in which the defendant in *Doe v. State* attempted to remain involved in his child's life despite being in prison. *Id.*

Father points to *Hopper* for the proposition that the no contact order between Mother and Father illegally prevented him from developing a relationship with GP and that, therefore, Mother was benefiting from acts that denied Father access to GP. *Hopper* involved a no contact order that was based on a false claim of domestic violence. *Hopper*, 144 Idaho at 625, 167 P.3d at 762. In this case, Father acknowledges that he "had legal issues with [Mother] which led to the non-expiring no contact order." To the extent that *Hopper* is relevant, Father must show at minimum that Mother's conduct restricted Father's attempts to develop a parent-child relationship. *Id.* at 627, 167 P.3d at 764. Unlike *Hopper*, in this case there was no evidence that Mother took steps intended to frustrate Father's ability to have contact with GP.

Rather, the record reflects no meaningful effort by Father to develop a parent-child relationship. As the magistrate court correctly pointed out, the no contact order does not prohibit Father from having contact with GP. Nevertheless, he has never attempted to provide GP with gifts, clothing, "tokens of love" or moral guidance nor has he attempted to offer financial support for GP. Rather, Father's immediate focus following GP's birth was on "getting [his] life in order." After he "achieved stability" in the fall of 2007, in the following year and a half leading up to trial, Father's efforts on GP's behalf were limited "pray[ing] for her and her family." While Father is to be commended, as the magistrate judge noted, for repairing his life, the absence of any attempt to create a parent-child relationship with GP constitutes substantial evidence supporting the magistrate court's finding of abandonment.

Father also challenges the magistrate court's finding that the termination of his parental rights would be in GP's best interest. In doing so, he cites no legal authority. Rather, he argues that the testimony of Kristina Brennan, focusing only on Step-Father, does not support a finding that termination of Father's parental rights was in GP's best interests.

Although Brennan's testimony was undoubtedly significant, there is other evidence in the record upon which the magistrate judge relied in reaching the conclusion that termination of Father's parental rights was in GP's best interests. The trial court considered the marked contrast in the quality of the relationships between Mother and Father and Step-Father. The former was "unpredictable, threatening, irrational, not thoughtful" while the latter was "respectful, committed, and loving." The magistrate court's factual findings include a lengthy discussion of the lack of stability in Father's life, based upon his testimony, including repeated hospitalizations, substance abuse and contacts with the criminal justice system. The magistrate judge also noted Father's testimony explaining why he had not developed a relationship with GP.

Brennan testified as to her observation that Step-Father and GP share "a healthy father-daughter relationship" and she described the relationship as "very loving." She concluded that if Step-Father were to adopt GP, it would "provide[] a sense of permanency for the child." The interests in affording GP a stable home-life and stable parental relationships are significant. We conclude that substantial evidence supports the magistrate court's finding that termination of the parent-child relationship is in GP's best interests.

**B. Father has not shown that the magistrate court's discretionary decisions were the result of abuse of discretion.**

On appeal, Father makes two arguments that the magistrate judge erred. First, he argues that the magistrate court's refusal to grant a continuance for the appointment of a guardian ad litem violated I.R.C.P. 16(d). Second, he argues that the magistrate court erred by refusing to allow Father's expert to testify because of tardy disclosure. We consider these claims in turn.

The pre-trial conference was conducted on April 13, 2009, seven days before the scheduled trial. At that time, Father stipulated that Brennan could appear and provide testimony telephonically. Three days later, Father moved to continue the trial for the appointment of a guardian ad litem. The basis of the motion was that Brennan's testimony was "inherently biased." The motion was denied as untimely the following day without hearing.

On appeal, Father argues that the need for the appointment of a guardian ad litem did not become apparent until the pre-trial conference. He asserts that the magistrate court erred by conducting the pre-trial conference only seven days before trial and if it had been conducted earlier, a guardian ad litem would have been able to "assess the situation and provide an

unbiased report regarding the best interests of the child." There are several difficulties with Father's claim, each of which would support our decision to affirm the trial court on this issue.

First, Father did not alert the trial court to this claim of error, although the date of the pre-trial conference was set almost three months before the trial. This Court will not consider claims of error raised for the first time on appeal. *Michalk v. Michalk*, 148 Idaho 224, 232, 220 P.3d 580, 588 (2009). Second, Father's claim is predicated upon a misreading of the applicable rule of civil procedure. Idaho Rule of Civil Procedure 16(d) provides that a "pre-trial conference shall be held in any action *if requested by any party in writing at least 20 days before trial . . . .*" (emphasis added). This rule does not require that the pre-trial conference be conducted at least 20 days before trial; the rule requires that a request for the conference must be made at least 20 days in advance of trial. Third, "[a] decision to grant or deny a motion for continuance is vested in the sound discretion of the trial court." *Gunter v. Murphy's Lounge, LLC*, 141 Idaho 16, 24, 105 P.3d 676, 684 (2005). Father has failed to show that the magistrate court's decision was outside the boundaries of its discretion, that the decision was inconsistent with the applicable legal standards, or that the decision was not based upon the exercise of reason. Accordingly, Father has failed to demonstrate an abuse of discretion. Finally, this Court will not reverse unless the trial court's denial of a requested continuance has resulted in prejudice to the moving party. *Vendelin v. Costco Wholesale Corp.*, 140 Idaho 416, 425, 95 P.3d 34, 43 (2004) (citing *State v. Nunez,* 133 Idaho 13, 21, 981 P.2d 738, 746 (1999); *State v. Wood,* 132 Idaho 88, 106, 967 P.2d 702, 720 (1998)); *see also Villa Highlands, LLC v. Western Community Ins. Co*., 148 Idaho 598, ___, 226 P.3d 540, 550 (2010). Father has simply failed to demonstrate prejudice resulting from the denial of the requested continuance. As Mother and Step-Father point out, a guardian ad litem is not required in a termination of parental rights proceeding. "The court *may* in [cases not involving an incompetent parent] appoint a guardian ad litem, as may be deemed necessary or desirable, for any party." I.C. § 16-2007 (emphasis added). We would have to speculate what the substance of any "unbiased report" may have been in order to conclude that it would not support the magistrate judge's determination that Father did not abandon GP or that termination was not in GP's best interests.

Father further argues that the magistrate court erred by excluding his late-identified expert witness who intended to testify as to Father's progress in substance abuse and mental health treatment. While the testimony was arguably relevant to impeach previous testimony that

Father's mental health and substance abuse issues impaired his ability to develop a parent-child relationship with GP, Father's argument fails because the claim that the testimony was for impeachment purposes was not raised at the time of trial. As previously noted, this Court will not consider issues raised for the first time on appeal. *Michalk,* 148 Idaho at 232, 220 P.3d at 588.

For the foregoing reasons, we conclude that Father's claims that the magistrate judge abused her discretion are without merit.

**C. We do not reach the question of whether Father had parental rights that could be terminated.**

Because we affirm the magistrate court's termination of Father's parental rights, we do not reach Mother and Step-Father's alternative argument that, because Father did not comply with the requirements of I.C. § 16-1504, he had no parental rights to terminate.

## IV. CONCLUSION

We affirm the magistrate court's order terminating Father's parental rights. Costs to Respondents.

Chief Justice EISMANN, Justices BURDICK, J. JONES and W. JONES **CONCUR**.