# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49777

In the Matter of: Jane Doe I and John Doe I, )
Children Under Eighteen (18) Years of Age. )
_____ )
  )
STATE OF IDAHO, DEPARTMENT )    Boise, September 2022 Term
OF HEALTH AND WELFARE, )
  )    Opinion Filed: November 3, 2022
      Petitioner-Respondent, )
  )    Melanie Gagnepain, Clerk
v. )
  )
JANE DOE (2022-22), )
  )
      Respondent-Appellant. )
_____ )

Appeal from the Magistrate Division of the First Judicial District of the State of Idaho, Kootenai County. James D. Stow, Magistrate Judge.

The decision of the magistrate court is affirmed.

Patricia L. Espeland, Office of the Kootenai County Public Defender, Coeur d' Alene, attorney for Appellant.

Denise L. Rosen, Deputy Idaho Attorney General, Coeur d'Alene, attorney for Respondent.

_____

BEVAN, Chief Justice.

Jane Doe (Mother) appeals from a magistrate court's judgment granting the Idaho Department of Health and Welfare's (the Department) petition to terminate her parental rights to her minor children, Jane Doe I and John Doe I (the children)[1]. The magistrate court determined that Mother had neglected the children as defined in Idaho Code section 16-2002(3)(b), and that termination was in the best interests of the children. On appeal, Mother asserts that the definition of "neglect" provided in section 16-2002(3)(b) violates the Idaho and the United States

---

[1] Father was part of the original proceedings, and his parental rights were also terminated. He did not file an appeal.

Constitutions, and she argues that the magistrate court's finding that termination was in the children's best interests was not supported by substantial and competent evidence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case stems from a child protection action in Kootenai County, Idaho. On May 3, 2020, Jane Doe I (born in July 2016) and John Doe I (born in December 2018) were sheltered by law enforcement after Mother was arrested for driving under the influence (DUI) while the children were in the car. Mother was charged with a DUI and Injury to Child. A shelter care hearing took place on May 5, 2020, at which Mother stipulated to the children remaining under the temporary legal custody of the Department.

In June 2020, the magistrate court ordered a case plan for Mother. The case plan outlined safety concerns, personal goals for Mother, and tasks she needed to complete to accomplish reunification. The primary concerns related to substance abuse, lack of stable housing, lack of employment, mental health issues, and violence in the home. The case plan specifically referenced:

> [Mother] has a significate [sic] history of substance use and reports self-medicating with methamphetamines and marijuana due to symptoms of depression. [Mother] reports she does not want to give up using marijuana and does not feel she has a significant problem with methamphetamine despite past and pending criminal charges regarding these substances. [Mother] also reports struggling with sobriety around [Father]. [Mother] is unable to provide for the safety and wellbeing need[s] of her children due to her homelessness and unemployment.

The first goal identified was that Mother "will demonstrate the ability to engage in a clean and sober lifestyle free from methamphetamines, marijuana as well as alcohol and/or other illegal substances." Another goal was for Mother to "demonstrate that she can provide for the ongoing safety and well-being needs of her children." She was to "establish and secure stable housing free from paraphernalia and substances." Mother was present and represented by counsel at a hearing discussing the case plan and stipulated the case plan was acceptable.

The magistrate court conducted regular review hearings, where it made findings concerning (1) the need for the children to remain in the legal custody of the Department and (2) the reasonable efforts that had been made by the Department to pursue reunification. Although Mother complied with most of the mandatory drug tests, she routinely tested positive for marijuana throughout the case. The Department discussed with Mother its concerns about the impact her continued marijuana usage had on the children's safety and well-being, but Mother disagreed,

maintaining, despite the case plan, that her marijuana use had no adverse effect on her children's safety or well-being.

At a permanency hearing on March 2, 2021, the magistrate court ordered a permanency plan with reunification as the primary goal and termination of parental rights as a secondary goal, with Mother's weekly visitation continuing. The children remained in the legal custody of the Department. Recurrent permanency review hearings took place over the next several months, at which the court found the Department continued to make reasonable efforts to finalize the permanency plan of reunification as the primary goal and termination of parental rights as a secondary goal. However, Mother continued to test positive for marijuana use during this time.

Nearly a year after the children were first sheltered, Mother obtained housing in April 2021. Mother lived with Father in a two-bedroom mobile home in the state of Washington. Mother's 17-year-old daughter, C.W., and the daughter's boyfriend lived in this home for a time. Mother's parental rights had been previously terminated to this daughter, as well as to two other children.[2]

Because Mother lived across the Idaho state line in Washington, an Interstate Compact on the Placement of Children (ICPC) process was required. The ICPC is a contract among states intended to ensure that children placed across state lines receive adequate protection and services. *See* 159 Am. Jur. Trials 97 (2019); I.C. § 16-2101. The Department launched that ICPC process once Mother secured housing. As part of the ICPC, Idaho asked Washington to complete a home study and assess whether the home environment and the parents were considered an appropriate placement for the children. Washington completed its own background checks and home visits as part of the process.

In April 2021, the Department recommended moving forward with termination of parental rights, citing Mother's minimal case plan progress. The Department explained there had been a lack of accountability and Mother had not addressed the concerns that originally brought the children into the State's custody. At a review hearing on May 4, 2021, the Department continued to cite concerns about positive marijuana tests and Mother's ongoing substance abuse. The magistrate court declined to change the permanency plan at that time, leaving the primary goal as

---

[2] Mother's oldest child, S.J. was involved in a child protection matter in Montana when he was fourteen. Some years later, Mother voluntarily terminated her rights to two other children, C.W. and M.W., when they were five and four. Mother explained "at that time in my life it – I wasn't in the position to raise those kids. They weren't better off with me at that point in my life. It was actually better for them to go off and be with another family or be with other people besides me so – I wasn't what was best in their lives at that time and I just – you know, I knew that. I realized that."

3

reunification but stressing that it was time for Mother to show effort and establish basic parenting skills.

On July 20, 2021, the Department requested Mother complete a hair follicle test after it received information that methamphetamine was still being used in the home. Mother refused to complete a hair follicle test stating, "I'm not in trouble I am not on probation and I believe UAs are sufficient." Mother continued to test positive for marijuana and alcohol in her UAs.

In August 2021, the Department again asked the magistrate court to move forward with termination as the primary goal rather than reunification, reasoning that Mother had made only minimal progress on her case plan to address the significant concerns that brought the children into care. In particular, the Department cited the continued substance abuse, lack of engagement in the ICPC process, as well as Mother's lack of accountability.

Mother's employment was sporadic throughout the case. In March 2021, Mother reported that she began working at Walmart in Spokane, Washington; however, she never provided proof of employment. At the end of April 2021, Mother reported she no longer worked at Walmart because she could make more on unemployment. In June 2021, Mother told the Department she had been hired by Amazon; however, she never provided proof of employment. On August 30, 2021, Mother reported that she was hired part-time at Dollar Tree. This was confirmed through pay stubs Mother provided to the Department.

Following a permanency review hearing on November 9, 2021, the magistrate court amended the ordered permanency plan to termination of parental rights as the primary goal and reunification as the secondary goal. The children continued to remain in the Department's custody.

On December 14, 2021, the Department petitioned to terminate parental rights on four grounds, including an allegation that "[t]he parent[s] ha[ve] neglected the children because the parent[s] ha[ve] failed to comply with the court's orders in a children protective act case or the case plan, and reunification of the children with the parent[s] has/have not occurred within the time standards set forth in Idaho Code [section] 16-2002(3)(b)." The Department also alleged "termination is in the best interest of the parent[s] and the children." The Department attached its report of investigation for termination of parent-children relationship.

A trial was held on March 30, through April 1, 2022. Although various grounds were alleged in the Department's petition, the focus at trial, and ultimately in the magistrate court's

decision, was on whether the Department had proven the grounds of neglect for the parents' failure to comply with the case plan and whether termination would be in the best interests of the children.

Mother's attorney argued Idaho Code section 16-2002(3)(b) could not be the basis for termination because "[t]he case plan has been completed." Mother's attorney referenced testimony that "GAINs were done, treatment had been attended, couples counseling had been attempted, housing has been found, employment has been found, [and] 24-hour safety monitors were identified." Mother's attorney then argued that the Department was creating a "moving target" by requiring ICPC when it was not mentioned in Mother's case plan.

Mother also advocated that a requirement outside the case plan violates the parents' due process rights, since they could not know what to do in order to satisfy the Department and the court's concerns. The Department responded to this argument, explaining that the ICPC was not a case plan task, but an independent statutory requirement that must be fulfilled to place a child outside of Idaho. I.C. § 16-2101.

Mother's attorney separately acknowledged the Department's concern that Mother was continuing to use marijuana. However, Mother's attorney argued that marijuana use is legal in Washington, there were no allegations Mother used marijuana in the state of Idaho, and that there was "no evidence . . . that it has actively affected her ability to be a responsible parent." In response, the Department's attorney emphasized that

> checking boxes because you have a home and jobs doesn't always complete the job, and in the case plan it requires [Mother] will demonstrate the ability to engage in a clean and sober lifestyle free from methamphetamine, marijuana, as well as alcohol and other illegal substances. This court ordered that, and [Mother has] not demonstrated that. [She is] making a constant choice to use marijuana, and that is a barrier."

Ultimately, the Department maintained this case plan was not out of Mother's control, and it was her choice to continue to use marijuana over regaining custody of her children.

On May 23, 2022, the magistrate court entered written findings of fact and conclusions of law terminating Mother's parental rights. The magistrate court acknowledged that Mother had completed several tasks identified in her case plan:

> (a) obtained a substance abuse evaluation; (b) signed necessary releases; (c) completed the designated parenting program; (d) completed the Coping Skills Group; (e) completed Moral Reconation Therapy; (f) obtained a mental health evaluation; (g) obtained a parental fitness evaluation; (h) obtained suitable housing ([a]lthough this housing has not been drug free based on the testing results for both

5

parents); (i) obtained employment; (j) consistently exercised visitation times with both children.

That said, the magistrate court found by clear and convincing evidence that Mother had failed to comply with a court order and/or complete or comply with her case plan. Specifically, Mother failed to (1) complete out-patient treatment, (2) comply with the drug test requirements in her case plan, and (3) demonstrate the ability to remain free from intoxicating substances including alcohol and marijuana. Although Mother mostly complied with drug testing, she missed tests and specifically refused a hair follicle test to determine whether she had used other illicit substances. Mother consistently tested positive for marijuana and sporadically tested positive for alcohol, and said she had no intention to stop using marijuana. The court found Mother had the ability to comply with her case plan and she was responsible for failing to do so. The court also recognized that Washington rejected placement, citing both parents' need to engage in drug and alcohol evaluation/treatment and that Mother still needed to complete a psychological evaluation. The magistrate court concluded that, by clear and convincing evidence, it was in the best interests of both children to terminate Mother's parental rights. Mother filed a timely notice of appeal.

## II. STANDARD OF REVIEW

"Idaho Code section 16-2005(1) provides that a court may terminate parental rights if it finds that doing so is in the best interests of the child and that at least one of five grounds for termination is satisfied." *Int. of Doe I*, 166 Idaho 173, 177, 457 P.3d 154, 158 (2020) (cleaned up). "The trial court must find that grounds for terminating parental rights have been proven by clear and convincing evidence." *Id*. The clear and convincing evidence standard is met when there is "evidence indicating that the thing to be proved is highly probable or reasonably certain." *Id*.

On appeal, this Court does not reweigh the evidence to determine whether it was clear and convincing. *Id*. This Court will not disturb the magistrate court's decision to terminate parental rights where there is "substantial, competent evidence in the record to support the decision." *Id*. "Substantial, competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. "This Court will indulge all reasonable inferences in support of the trial court's judgment." *Id*.

## III. ANALYSIS

A.    **We decline to rule on the constitutionality of Idaho Code section 16-2002(3)(b) because this argument was not raised below.**

6

The first issue presented on appeal is "[w]hether Mother was deprived of Due Process when the Magistrate Court applied the definition of 'neglect' provided in 16-2002(3)(b)." Mother argues section 16-2003(3)(b)'s definition of "neglect" violates the Idaho and United States Constitutions.

Idaho Code section 16-2002(3)(b) defines "neglect" in the context of a parent's failure to comply with a case plan as:

. . . .

(b) The parent(s) has failed to comply with the court's orders or the case plan in a child protective act case and:

(i) The department has had temporary or legal custody of the child for fifteen (15) of the most recent twenty-two (22) months; and

(ii) Reunification has not been accomplished by the last day of the fifteenth month in which the child has been in the temporary or legal custody of the department.

I.C. § 16-2002(3)(b).

A finding of neglect under section 16-2002(3)(b) requires the magistrate court to "find that the parent is responsible, whether directly or indirectly, for non-compliance with the requirements of a case plan. This requirement reflects the reality presented by parents who engage in behavior that results in non-compliance with no apparent thought or consideration of the effects of that behavior upon the case plan." *Idaho Dep't of Health & Welfare v. Doe*, 161 Idaho 596, 600, 389 P.3d 141, 145 (2016) (footnote omitted); *Int. of Doe I*, 166 Idaho 57, 65, 454 P.3d 1140, 1148 (2019).

Mother argues this standard permits Idaho courts to terminate parental rights to children simply for failing to complete one term of a case plan. Mother continues, "[i]n other words, if a parent has twenty requirements in their case plan and they complete nineteen of those requirements, the Idaho courts will terminate that parent's rights to their child based on the definition of 'neglect' provided in Idaho Code 16-2002(3)(b)." Mother contends that this definition of "neglect" violates her due process rights because the definition inherently favors terminating parental rights, rather than supporting reunifying the parent and the child.

"The United States Supreme Court has held that a parent has a fundamental liberty interest in maintaining a relationship with his or her child." *In Int. of Doe*, 164 Idaho 143, 145–46, 426 P.3d 1243, 1245–46 (2018) (quoting *Quilloin v. Walcott*, 434 U.S. 246 (1978)). Indeed, the United States Supreme Court has stated that "[t]he liberty interest at issue in this case—the interest of

parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The State of Idaho has also recognized the importance of the family relationship: "Implicit in [the Termination of Parent and Child Relationship] act is the philosophy that wherever possible family life should be strengthened and preserved. . . ." *In Int. of Doe*, 164 Idaho at 145–46, 426 P.3d at 1245–46. "Termination of the parent-child relationship is among the most drastic forms of state action which can be conceived." *Idaho Dep't of Health & Welfare v. Doe*, 161 Idaho 596, 600, 389 P.3d 141, 145 (2016). Thus, "the requisites of due process must be met when the Department intervenes to terminate the parent-child relationship." *In Int. of Doe*, 164 Idaho at 145–46, 426 P.3d at 1245–46.

Though we appreciate the fundamental rights at stake here, we also recognize that, despite the arguments raised on appeal, Mother did not challenge the constitutionality of Idaho Code section 16-2003(3)(b) below. In general, "[i]n appeals before this Court from a termination of parental rights, '[t]his Court will not consider claims of error raised for the first time on appeal.' " *In re Doe*, 156 Idaho 682, 687–88, 330 P.3d 1040, 1045–46 (2014) (quoting *Doe v. Doe*, 149 Idaho 392, 398, 234 P.3d 716, 722 (2010)).

In *In re Doe*, this Court analyzed whether a father could raise a procedural due process argument on appeal when he did not raise that issue at trial below. 156 Idaho at 687, 330 P.3d at 1045. The Court began by recognizing that in the criminal context, a claimed error may still be reviewed on appeal where the error raised constitutes fundamental error. *Id.* (citing *State v. Gomez*, 153 Idaho 253, 255, 281 P.3d 90, 92 (2012) (holding that a fundamental error in a criminal case may be reviewed by this Court even though the issue or objection was not raised at trial)). However, the Court held the fundamental error analysis was inapplicable to termination appeals because such cases are civil, not criminal or quasi-criminal matters. *Id.* In so holding, this Court adopted the rationale of the Texas Supreme Court from *In re B.L.D.*, 113 S.W.3d 340 (Tex. 2003). There, the court reasoned that because parental termination cases do not apply criminal procedural or evidentiary rules, the fundamental error doctrine, rooted in criminal law, was not applicable. *Id.* (citing *In re B.L.D.*, 113 S.W.3d at 351). This Court ultimately determined that the father's procedural due process argument was not reviewable because it was not raised below. *Id.*

Though Mother briefly argued her due process rights were violated below, her argument was made solely in the context of the case plan's failure to mention the ICPC. Mother did not

reference, let alone challenge, the definition of "neglect" provided in Idaho Code section 16-2002(3)(b). The only dispute about section 16-2002(3)(b)'s applicability focused on Mother's argument that section 16-2002(3)(b) could not be the basis for termination because "[t]he case plan has been completed." Mother's attorney listed portions of the case plan Mother had complied with, but ignored Mother's failure to maintain a clean and sober lifestyle free from methamphetamine, marijuana, as well as alcohol, as required by the case plan. There was also no explanation offered for Mother's refusal to complete a hair follicle test. Although we continue to recognize the importance of the fundamental rights at issue, this Court has declined to carve out an exception to the preservation rule in termination proceedings. We also note that Mother has not addressed the fact that her arguments were not raised below or argued the principles adopted in *In re Doe* should be overruled. As a result, we continue to adhere to that decision today.

The magistrate court ultimately found, by clear and convincing evidence, termination was appropriate under section 16-2002(3)(b) because Mother failed to comply with a court order and/or complete or comply with her respective case plan. Specifically, Mother failed to complete out-patient treatment, comply with the drug testing requirements in her case plan, and failed to show the ability to remain free from substances including alcohol and marijuana. Because Mother's constitutional argument concerning Idaho Code section 16-2002(3)(b)'s definition of "neglect" was not raised below, we decline to consider it for the first time on appeal. As such, we affirm the magistrate court's finding that termination was appropriate under section 16-2002(3)(b).

**B.      Substantial and competent evidence supports the magistrate court's finding that termination was in the best interests of the children.**

Mother separately challenges the magistrate court's finding that termination was in the best interests of the children. "Once a statutory ground for termination has been established, the trial court must next determine whether it is in the best interests of the child to terminate the parent-child relationship. When considering the best interests of the child, a trial court may consider numerous factors." *Matter of Doe I*, 170 Idaho 581, 514 P.3d 991, 1003 (2022) (quoting *In re Doe*, 159 Idaho 192, 198, 358 P.3d 77, 83 (2015)). Some factors the trial court may consider include: a "parent's history with substance abuse, whether the parent has provided financial support, the child's relationship with those currently caring for him or her and whether the child has improved under that care, the child's need for stability and certainty, and the parent's incarceration." *Id*. A

finding that termination is in the best interests of the child must be supported by substantial and competent evidence. *Id.*

Mother argues there was substantial evidence to support that she did cooperate with the Department in completing her case plan. Mother established employment, financial stability, a home, and continued her relationship with her children throughout the case. She also maintains that marijuana use is legal in Washington state and therefore should not have been weighed against her. Further, Mother claims the evidence did not support terminating her parental rights because: "the children clearly had a bond to Mother and sought out her attention during visits. The children were comforted by Mother when they were upset, and Mother made every single visit timely. There was no evidence presented that the children were endangered by Mother's continued marijuana use in a state where such use is legal."

At the time of trial, it had been more than twenty-two months since placement of the children in shelter care. The magistrate court found the children's ages, roughly 3 and 5, were an important consideration as to the level of parenting that was needed, recognizing that they were of an age dependent on adults to provide for their basic needs and safety. The magistrate court found Mother was unlikely to reshape her lifestyle, seeing as she had previously lost parental rights and custody to three prior children. The magistrate court also highlighted Mother's significant drug history and likelihood of continuing/returning to drug use. The court cited testimony that any use of a "drug of impairment" by a parent is a concern, especially with younger/dependent children.

The magistrate court also noted concerns with Mother's residence, including the inability to obtain a positive ICPC report from Washington (noting that a positive ICPC "appear[ed] dependent on first completing the key components of the case plan and then re-applying"). The magistrate court also had concerns that the home consisted of a two-bedroom residence where Mother, Father, Mother's 17-year-old daughter to whom Mother had lost her parental rights, and the daughter's boyfriend, lived. In addition, the magistrate court had recognized that Mother's housing had not been drug-free based on the testing results for both parents. Conversely, the court recognized the children were doing well in foster placement. Although there were initially three placements, the current setting was established and both children were described as doing better and still living together.

The magistrate court acknowledged Mother's efforts and the bond she shared with the children. In addition, the court recognized that Mother made meaningful efforts toward her case

10

plan by obtaining a residence and employment, attending evaluations, and completing some programs. That said, the court found by clear and convincing evidence that Mother failed to follow through with drug treatment, which was needed given her incessant drug use. Ultimately, the court found there was little reason to believe circumstances would change in the foreseeable future even if Mother's rights were not terminated. The court determined the children were in a better, more stable situation and deserved a permanent and stable future to meet their best interests.

The magistrate court's findings are supported by substantial and competent evidence. The magistrate court gave the testimony of the assigned caseworker, Courtney Krohn, substantial weight after finding it to be credible and well-reasoned. Krohn observed about 15 to 20 of Mother's supervised visits during this case and was present approximately six times to see the children at their foster placement. Krohn opined that termination of parental rights would be in the best interests of the children for four reasons: the length of time since sheltering without reunification, the parents' continued substance use, Mother's inability to meet the needs of the children, particularly given the children's ages, and attachment issues.

Mother's focus on the legality of marijuana in Washington ignores the reality of how substance use (legal or not) impacts her ability to safely parent her children. Krohn testified during trial:

> Q. Okay. And so that -- you also talked about protective capacities were an issue. Can you describe what you mean by that?
>
> A. Absolutely. So when we have parents who are struggling to have insight around their – how their [substance] use is impacting their children, that is a major concern for the Department, so when people believe that their substance abuse does not harm the children or that they can function as parents while they're actively using, that's very concerning to the Department. . . .
>
> [Mother] has an extensive history of substance abuse as we've heard and seen, but also as per my review of all the information, and so when we're looking at [Mother] and how she's continuing to use marijuana every single day, the Department had conversations with her multiple, multiple times regarding our concerns towards substance abuse.
>
> When someone is actively using a substance, whether it's alcohol, marijuana, whether it's legal or illegal, they are impaired, and so when you are impaired you are not able to be present and actively engaged in order to keep your children safe and take action to keep them safe.
>
> Q. Okay. And did you discuss that with [Mother]?
>
> A. Yes.

11

Q. And what was her response to you about that? . . .

A. [Mother] reported she had no intention of quitting marijuana use.

Krohn further testified that Mother had not substantially completed the substance abuse treatment requirement:

> [U]ltimately what we're talking about is substance abuse, any sort of mind altering substance that an individual is using for purposes other than just, like, for fun, right, so like recreational, periodic marijuana use versus daily marijuana use that has been, admittedly by the client, used to help them manage their own mental health symptoms, and so if you're self-medicating, what is the purpose . . .
>
> Q. Did [Mother] – did she give you any reasons why she continued to use marijuana?
>
> A. . . . . because she likes it.
>
> Q. Okay. Anything else?
>
> A.  . . . She expressed at one point that it helps her sleep and also that it provides her comfort.
>
> Q. Okay. So the helps-her-sleep issues, does that cause a concern for safety of the Department with children in the home?
>
> A. Especially with – so it provides a concern for the Department for children of a certain age. So when children are too young to be able to take action to keep themselves safe, as in this situation we have a three-year-old and a five-year old, it is concerning because if a person – a parent is asleep and they're using a substance to help them sleep, they might not be able to be aroused or be available to take action and maybe take – in the event that something is happening and the children need help.

Further, although Mother claims "the children clearly had a bond to Mother and sought out her attention during visits," there is also testimony that the children experienced a great deal of dysregulation[3] during and following visitation. Krohn described the dysregulation as lashing out by running and hitting or being belligerent. The dysregulation was so extreme at the beginning of the case that the first two foster homes asked that the children be removed from their homes. After several months, Mother brought activities and healthier snacks for the children, which helped reduce the amount of dysregulation experienced during visitation. Still, Krohn testified that the

---

[3] "Dysregulation" is defined as "impairment of a physiological regulatory mechanism (as that governing metabolism, immune response, or organ function)." *Dysregulation*, MERRIAM-WEBSTER, 2022, https://www.merriam-webster.com/medical/dysregulation (last accessed October 20, 2022).

children were happy and doing well in the foster home, and did not exhibit the same kind of behaviors that had been previously exhibited during and after visitations with Mother.

Mother had sixteen prior referrals to the Department by the time the case came to the magistrate court's attention. Mother has had her parental rights terminated or otherwise lost her parental involvement with three older children, all in circumstances related to child protection actions. By trial, the children had been in the custody of the Department more than twenty-two months. Mother had refused to address the primary safety issue identified in the case plan: completing substance abuse treatment or abstaining from marijuana. The Department assessed the children would not be safe if placed with Mother due to the unresolved safety issues and the ages of the children. The magistrate court ultimately found it was in the children's best interests to terminate Mother's parental rights. This finding is supported by substantial and competent evidence. Thus, we affirm.

## IV. CONCLUSION

The magistrate court found, by clear and convincing evidence that Mother's parental rights should be terminated. That decision is supported by substantial and competent evidence in the record. It is therefore affirmed.

Justices BRODY, STEGNER, MOELLER, and ZAHN CONCUR.